## PASCO TERMINALS, INC.

### v.

## UNITED STATES.

### C.D. 4658; Court No. 74-5-01357.

United States Customs Court.

June 21, 1976.

Williams, Connolly & Califano, Washington, D. C. (J. Alan Galbraith, Washington, D. C., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Velta A. Melnbrencis, New York City, trial attorney), for defendant.

MALETZ, Judge:

Defendant has moved pursuant to rule 4.7(b)(1) and (2) to dismiss the present action for lack of jurisdiction on the ground that plaintiff is neither an importer, consignee or authorized agent within the meaning of section 514 of the Tariff Act of 1930, as amended (19 U.S.C. § 1514),[1] and hence lacked standing to file the protests herein and, upon their denial, to invoke the jurisdiction of this court under 28 U.S.C. § 1582, as amended.[2]

The action to which this motion is addressed involves the validity of the assess-

---

1. Section 514, as amended by the Customs Courts Act of 1970, provides that certain specified administrative decisions of the appropriate customs officer shall be final and conclusive upon all persons unless—

(a) . . . a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Customs Court . . . . .

and that—

(b)(1) . . . protests may be filed by the importer, consignee, or any authorized agent of the person paying any charge or exaction, . . . . .

2. Section 1582, as amended, *supra*, provides, in pertinent part, that this court—

(a) . . . shall have exclusive jurisdiction of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, . . . . .

\* \* \* \* \* \*

(c) . . . shall not have jurisdiction of an action unless (1) either a protest has been filed, as prescribed by section 514 of the Tariff Act of 1930, as amended, and denied . . . . .

ment of dumping duties on four entries of crude sulphur in bulk exported from Coatzacoalcos, Veracruz, Mexico aboard the *S.S. Harold H. Jaquet* and imported through the ports of Philadelphia and Wilmington.

The issue raised by defendant's motion to dismiss, i. e., whether Pasco is a proper party plaintiff herein, has its origin in an Antidumping Proceeding Notice published on April 6, 1971 by the Secretary of the Treasury in connection with elemental sulphur exported from Mexico (36 Fed.Reg. 6526). On November 6, 1971, the Bureau of Customs (now renamed the Customs Service) published a Withholding of Appraisement Notice (36 Fed.Reg. 21364) in connection with elemental sulphur exported from Mexico to commence on November 7, 1971. On February 5, 1972, the Office of the Secretary of the Treasury published a determination (37 Fed.Reg. 2793), dated February 3, 1972, that elemental sulphur from Mexico was being, or likely to be, sold at less than fair value. On May 4, 1972, the Tariff Commission (now renamed the International Trade Commission) notified the Secretary of the Treasury that an industry in the United States was being injured by reason of imports from Mexico of sulphur sold or likely to be sold at less than fair value.

On May 10, 1972, the Tariff Commission published its opinion determining injury (37 Fed.Reg. 9417), and on June 28, 1972, the Assistant Secretary of the Treasury published a finding of dumping with respect to such sulphur (37 Fed.Reg. 12727; T.D. 72–179).

Prior to the commencement of the dumping investigation, a sales agreement had been entered into on February 17, 1970 among Azufrera Panamericana, S.A. (Azufrera), a Mexican corporation, E. I. DuPont de Nemours and Company (DuPont), a Delaware corporation, and Caribbean Sulphur Shipping Company, Limited (Caribbean), a Bahamian shipping company wholly owned by Azufrera. Under its terms (1) DuPont agreed to purchase from Azufrera at least 80% of its crude sulphur requirements for use at two of DuPont's plants in New Jersey; (2) Azufrera agreed to deliver the sulphur to its docks at Coatzacoalcos, Veracruz, Mexico and there to load same onto vessels supplied by Caribbean; (3) title to the sulphur and risk of loss thereof was to pass from Azufrera to DuPont when the sulphur was loaded onto the vessels at Coatzacoalcos; (4) Caribbean agreed to accept delivery of the sulphur at Coatzacoalcos in vessels provided by it and to transport and deliver same to docks provided and maintained by DuPont; (5) Caribbean agreed to be fully responsible for the safety and care of DuPont's sulphur from the time of loading at Coatzacoalcos until its discharge at DuPont's docks; (6) Caribbean agreed to obtain at its expense ocean marine cargo insurance from companies acceptable to DuPont for protection of itself and DuPont, and further agreed that the policies would name DuPont as an additional insured and provide for at least 10 days' prior written notice to the latter of any change in or termination of coverage; (7) the sum of $34.50 per long ton, which was to be paid to Azufrera and Caribbean collectively for each long ton sold under the contract, included payment both to Azufrera of the purchase price and to Caribbean for transporting the merchandise in accordance with requirements; (8) payment was to be made solely to Azufrera, or its order, as payment in full to both Azufrera and Caribbean which would make their own arrangements for remission of the transportation charges to the latter; (9) import licenses and any import duties or charges for importation of the sulphur sold under the contract into the United States were to be the responsibility of DuPont.

The sales agreement was extended through 1971 on the same terms and conditions except for a reduction in the delivered sales price to $28.50 per long ton.

Apparently, all parties to the agreement were satisfied with its terms until publication on November 6, 1971 of the Withhold-

ing of Appraisement Notice, which created, as plaintiff put it, "a new set of commercial realities." See p. 4 of plaintiff's memorandum replying to defendant's motion to dismiss. Although, under item 415.45 of the tariff schedules, crude sulphur entered the United States free of duty, the contracting parties were aware that the requisite investigations and determinations made by the Secretary of the Treasury and the Tariff Commission pursuant to section 201(a) of the Antidumping Act of 1921 (19 U.S.C. § 160(a)), might result, as they ultimately did, in the publication of a finding of dumping. In that event, dumping duties would be imposed on all imports of such merchandise commencing with crude sulphur entered after November 6, 1971 with respect to which appraisement was being withheld. Moreover, since the sales agreement provided that DuPont took title at Coatzacoalcos to the sulphur it purchased from Azufrera and also assumed liability for all import duties, DuPont would be liable for any dumping duties which might be assessed upon the crude sulphur it entered, or withdrew from warehouse, for consumption after November 6, 1971.

DuPont, however, which had contracted to pay $28.50 per long ton, would not, plaintiff claims, have taken delivery of the merchandise subject to a contingent dumping liability. Accordingly, as plaintiff's counsel stated during oral argument on the present motion, there was a decision to "take DuPont off the hook" (R. 39). Inasmuch as Pasco was wholly owned by Azufrera, and was authorized to do business in New Jersey where the merchandise was to be delivered—

. . . the management of Azufrera and Pasco Terminals resolved upon a sim-

ple plan, agreed to by DuPont: instead of making the sale to DuPont, Azufrera would make the sale to Pasco Terminals, a wholly owned subsidiary. *After* importation, Pasco Terminals would, in turn, make the sale to DuPont. [Plaintiff's memorandum p. 4. Emphasis in original.]

As part of this plan, Pasco was to be substituted for Azufrera as seller under the sales agreement. Pasco was also to be the "importer" of the merchandise and liable for all dumping duties that might thereafter be imposed, thus relieving DuPont of any such obligation under the 1970 contract.

The plan also served another purpose. It avoided, by reason of what plaintiff's counsel claimed to be the administrative practice of the Customs Service (R. 24–26), the effect of 19 U.S.C. §§ 160–162 which makes it clear that in calculating purchase price or exporter's sales price there shall be deducted the amount of any special dumping duties which are, or will be, paid by the manufacturer, producer, seller, or exporter, or which are, or will be, refunded to the importer by the manufacturer, producer, seller or exporter, directly or indirectly. See 19 CFR 153.49(a).[3] Since the dumping duty is measured by the difference between the "foreign market value" and the lesser purchase price or exporter's sales price, as the case may be, the result of decreasing the purchase price or exporter's sales price is to *increase* the dumping duty by an equal amount. It is further to be noted that 19 U.S.C. § 161 mandates the levying and collection of such dumping duties upon *all* unappraised merchandise—subject to a dumping finding—that was entered, or withdrawn from warehouse, for consumption, *up to 120 days* before the question of

---

**3.** In this connection, 19 CFR 153.56 provides that—

. . . It if appears that the merchandise is imported by a person who is the exporter within the meaning of such section 207, where the exporter's sales price is less than foreign market value, the special dumping duty shall equal the difference between the exporter's sales price and the foreign market value on the date of exportation, or, if there

is no foreign market value, between the exporter's sales price and the constructed value, any foreign currency involved being converted into U.S. money as of the date of exportation.

Under section 207 of the Antidumping Act, 1921 (19 U.S.C. § 166), an "exporter" of imported merchandise includes a person owned or controlled by the manufacturer or producer.

dumping was raised by or presented to the Secretary.

Plaintiff contends that the following events ensued, in the order listed: (1) the plan became effective on November 8, 1971; (2) it purchased the sulphur involved in the four entries herein from Azufrera on November 9 and December 6, 1971; (3) Dunnington and Arnold of Philadelphia, Inc. (sometimes hereafter referred to as "D & A"), a customhouse broker, acted as plaintiff's agent and arranged, pursuant to instructions, for entry of the merchandise as nominal owner, naming (or intending to name) plaintiff as ultimate consignee; and (4) after importation, plaintiff sold the sulphur to DuPont.

On the basis of the foregoing commercial and customs transactions, plaintiff claims to be the appropriate party under section 514, *supra*, to file the protests herein and to commence the instant action under section 1582, *supra*.

As evidence of the plan to modify the sales agreement and to relieve DuPont of any liability for dumping duties, plaintiff relies upon a letter, dated December 3, 1971, from Marlin E. Sandlin, vice chairman of the board and chief executive officer of Azufrera addressed to Robert P. French of DuPont's Purchasing Department, which reads as follows:

Gentlemen:

This will confirm our agreement effective November 8, 1971, to substitute our wholly owned subsidiary, Pasco Terminals, Inc., for Azufrera Panamericana, S.A., as the Seller under our Sulphur Sales Agreement with you dated February 17, 1970.

The effect of this Supplemental Agreement is to enable Pasco Terminals, Inc., to act as the importer of our sulphur sold and delivered to you in the United States and to relieve you of any liability or obligation under the Antidumping Act with respect to sulphur sold and delivered to you in the United States.

Pasco Terminals, Inc., will comply with whatever requirements may be imposed by the Bureau of Customs of the Treasury Department of the United States with respect to such sulphur deliveries.

If the above and foregoing is in accordance with your understanding of our agreement, please indicate your acceptance in the space provided below.

The notation below Marlin E. Sandlin's signature states:

ACCEPTED this the *28* th December, 1971.
E. I. duPont de Nemours & Co., Inc.
    By: [signature illegible]
        DIRECTOR
        Purchasing Department

Plaintiff also relies upon another letter, dated November 9, 1971, prepared by M. Brito of International Chartering Services, Inc. (International), as agent for Caribbean, and addressed to Lavino Shipping Co. (Lavino), its steamship agent in Philadelphia, which instructed Lavino to arrange for entry of the sulphur shipped on the *Harold H. Jaquet*, as follows:

S/S "HAROLD H. JAQUET" V/153
Gentlemen:

This confirms our telephone conversation of yesterday, whereby we informed you that commencing with the next arrival of the subject vessel at Thompson's Point and Deepwater Point on November 16, 1971, you should use the value of $28.50 per L.T. CIF on Azufrera Panamericana's Invoices for Customs Cargo Entry purposes.

We are detailing below the value distribution which should be shown in the invoices:

F.O.B. Value Coatzacoalcos  $23.00
Insurance                       .10
Freight                        5.40
                             $28.50

We wish to remind you again that these invoices are for Customs Entry and internal purposes only and are not to be delivered to; shown to; or discussed with any customer.

Also, commencing immediately and until otherwise instructed by us, please show in

Azufrera Panamericana's invoices Pasco's Terminal and the discharging port as Importer of the cargoes.

As requested in our telephone conversation yesterday, you will arrange to have your Custom House Broker post with each local Custom House an Anti Dumping Bond under the name of Pasco's Terminal, which will guarantee the payment of any duty and we understand from our conversation that Customs require a Bond for the 10% of the value of the cargo and the cost will be $0.50 per $1,000.00 with a minimum of $10.00.

Please have this additional Bond charge included in the regular Port Disbursements Account to us.

Thanking you for your cooperation on this matter, we remain,

It appears that Lavino, acting upon the foregoing instructions,[4] thereupon prepared four commercial invoices on Azufrera's letterhead billing Pasco for two sales of crude sulphur (covered by entries 003575 and 062A) on November 9, 1971 and for another two sales of crude sulphur (covered by entries 066A and 004007) on December 6, 1971.[5]

Lavino also engaged Dunnington and Arnold to arrange for entry of the sulphur and supplied the latter with the commercial invoices it had prepared for Azufrera and which were the basis for the four entries subsequently filed with the Bureau of Customs. D & A then entered the merchandise as importer of record and nominal consignee for DuPont on entry 003575[6] and for Pasco on the other three entries, as follows:

| Entry No. | Importer of Record | Date of Exportation | Date of Importation | Date of Entry |
|---|---|---|---|---|
| 003575 | Dunnington and Arnold of Philadelphia, Inc., for account of E. I. DuPont De Nemours | 10–13–71 | 11–1–71 | 11–29–71 Philadelphia, Pa. |
| 062A | Dunnington and Arnold of Phila., Inc., for account of Pascos Terminal | 11–11–71 | 11–16–71 | 11–18–71 Wilmington, Del. |
| 004007 | Dunnington and Arnold of Philadelphia, Inc., for account of Pascos Terminal | 11–30–71 | 12–8–71 | 12–14–71 Philadelphia, Pa. |

4. A letter dated May 5, 1975, from M. W. Mathiasen of Lavino to the U.S. Department of Justice, Customs Section, states, in pertinent part:

. . . Dunnington and Arnold were engaged and paid by Lavino Shipping Company, As Agents, to prepare Customs Entry papers for this shipment. We do not have copies of the entries on file and therefore cannot verify the entry numbers.

In accordance with the instructions from our principals, we prepared the invoices, copies of which are attached.

Also enclosed is a copy of the cargo receipt which was used in lieu of bill of lading.

5. An affidavit of Rodolfo Cruz Miramontes, general counsel of Azufrera and secretary of Azufrera's wholly-owned subsidiaries, Pasco and Caribbean, states that Pasco's records "reflect" that it "purchased sulphur from Azufrera on November 9, 1971 and December 6, 1971, f.

o. b. Coatzacoalcos, Veracruz," as shown by the consumption entries herein.

6. Dunnington and Arnold's vice president, James A. McCauley, states in an affidavit (p. 3) that the stenographer "should have typed in 'Pasco Terminals, Inc.'" instead of DuPont on entry 003575. He also states that there were two shipments of sulphur, but the cargo aboard each shipment was to be discharged at two different points in New Jersey (p. 2). However, the entries do not bear this out. In fact, there were three shipments from Mexico on the *Harold H. Jaquet*; the first (entry 003575) left Coatzacoalcos on 10–13–71; the second (entry 062A) left that port on 11–11–71; and the third (entries 066A and 004007), which had cargo destined for both Deepwater Point and Thompson's Point in New Jersey, left Coatzacoalcos on 11–30–71.

| Entry No. | Importer of Record | Date of Exportation | Date of Importation | Date of Entry |
|---|---|---|---|---|
| 066A | Dunnington and Arnold of Philadelphia, Inc., for account of Pascos Terminal | 11–30–71 | 12–9–71 | 12–29–71 Wilmington, Del. |

As no owner's declaration and superseding bond were filed pursuant to section 485(d) of the Tariff Act of 1930 (19 U.S.C. § 1485(d)),[7] D & A became liable to the government for any additional or increased duties levied against the merchandise. The entries were liquidated on October 26, 1973 and D & A was billed for the dumping duties assessed therein. Pasco paid the duties assessed in entries 062A, 066A and 004007, and reimbursed D & A for payment of the duties levied in entry 003575.

Plaintiff vigorously urges that its claims respecting the supplemental commercial agreement and the change in entry for customs purposes of the merchandise are fully substantiated by the aforementioned documents. Nonetheless, we find that examination of the cited documents in the light of other papers appended to the motions herein[8] places the alleged transactions in a somewhat different perspective.

For example, backtracking through the chain of command which resulted in the preparation of the instant entries by D & A, we note that the entries were based upon invoices prepared by Lavino upon instructions from its "principals," M. Brito of International, as agent for Caribbean. International, we are advised, had in turn received its instructions "from Warren H. Lansford that the cargo was to be imported by Pasco . . . ." See affidavit of M. Brito, p. 1. Lansford at that time was a director and secretary-treasurer of Pasco. See plaintiff's response to defendant's interrogatory 1(a) (contained in defendant's collective exhibit H) directed to Pasco. However, so far as can be ascertained, he served in no official capacity as an officer or employee of any party to the original sales agreement.

In other words, the instructions to International were not initiated by a party to the agreement, but by Pasco through its officer-director, Lansford. We find no judicial or statutory authority, in the absence of an authorized agency, for modification of an agreement by another who is a stranger thereto.

In this connection, it is noted that the sole evidence of the supplemental agreement between Azufrera and DuPont that became effective November 8, 1971 is the letter written almost four weeks later, on December 3, 1971. Apart from this letter, among the many exhibits submitted, there is not a single direct statement in affidavit or other form from anyone, let alone any officer or employee of Azufrera, DuPont or Caribbean alleging that he was a participant in or a party to the supplemental agreement or had personal knowledge thereof.[9]

It is further significant that a memorandum dated November 8, 1971,[10] prepared by

---

7. Section 485(d) provides that—

(d) A consignee shall not be liable for any additional or increased duties if (1) he declares at the time of entry that he is not the actual owner of the merchandise, (2) he furnishes the name and address of such owner, and (3) within ninety days from the date of entry he produces a declaration of such owner conditioned that he will pay all additional and increased duties, under such regulations as the Secretary of the Treasury may prescribe. Such owner shall possess all the rights of a consignee.

8. Plaintiff had moved for hearing and oral argument on defendant's motion to dismiss and appended additional documentary exhibits to its moving papers. Plaintiff's motion was granted and oral argument was held on November 25, 1975. Additional briefs were thereafter submitted pursuant to court order.

9. The answers to defendant's interrogatories indicate that Sandlin is deceased and that Lansford is no longer associated with Pasco.

10. The memorandum reads in pertinent part:
To: The File
Re: Posting of Bond in Azufrera Matter
I have reviewed the pertinent statutes and regulations under the Antidumping Act of 1921, as amended, in order to determine whether, upon the publication of Notice of

an attorney with the law firm appearing as plaintiff's counsel herein and his letter of *November 9, 1971* to Sandlin of Azufrera,[11] advising that it would be appropriate for either Azufrera or Pasco to act as importer of record for Azufrera's sulphur shipments to the United States and, in that capacity, to file any bonds required by customs, is hardly consistent with the claim that a supplemental agreement was entered into on *November 8, 1971.* The point is that on November 9, 1971, plaintiff's counsel advised Azufrera as to what arrangements *could be made* with respect to entering the merchandise, and yet, according to plaintiff, such arrangements *had already been made on November 8, 1971* by virtue of a claimed supplemental agreement.

We turn now to the commercial invoices which are the backbone of plaintiff's claim that the supplemental agreement was carried out so that, as plaintiff's counsel stated on oral argument (R. 24–25):

   .  .  . the transaction was a sale by Azufrera to Pasco *in Coatzacoalcos*, Pasco entered the merchandise into the United States, and *then* a sale by Pasco to Du-Pont. [Emphasis added.]

It is noted, with respect to the merchandise covered by entry 003575, that Azufrera's invoice to Pasco shows a sale of 6400 long tons of crude sulphur in bulk, f. o. b. Coatzacoalcos, at $23.00 per ton, plus insur-

ance and freight charges of $5.50, totalling $182,400.00, and is dated November 9, 1971. In turn, Pasco's invoice to DuPont shows a sale to the latter of 6320.080 long tons for $180,122.28 and is dated November 10, 1971. See invoice No. 1368 in defendant's collective exhibit I.

The problem with these invoices is that they show sales of a sulphur shipment which had already been exported from Coatzacoalcos on *October 13* and imported into the United States on *November 1, 1971, prior* to the supplemental agreement. In other words, under the original sales agreement, title had already passed to Du-Pont on or about October 13 when the merchandise was loaded aboard the *Harold H. Jaquet.* Furthermore, Lavino was instructed by International, in its letter of November 9, 1971, cited *supra*, to prepare Azufrera's invoices "for Customs Cargo Entry purposes," commencing with the next arrival of the vessel "at Thompson's Point and Deepwater Point on *November 16, 1971* . . . ." [Emphasis added.]

Apparently there was no intention initially to include a shipment that had already been landed in the United States. Accordingly, the invoices covering entry 003575 which purport to show (1) a sale by Azufrera to Pasco on November 9, 1971—eight days after the actual importation; and (2) a sale by Pasco to DuPont on November 10,

---

Withholding, Azufrera could itself post the bond required by 19 CFR § 153.54. .  .  .

   *    *    *    *    *    *

   I did not mention to Mr. Flynn [of the Customs Service] the concept of making all sales to PASCO Terminals but it would follow that if Azufrera's representative himself could post the bond to Customs, a wholly separate corporate entity such as PASCO Terminals could post the bond.

   Based on the foregoing I would conclude that *we advise Azufrera to invoice all of its United States sulphur sales through PASCO Terminals, Inc.* and deal with the bond matter accordingly. .  .  . [Emphasis added.]

11. The letter reads in pertinent part:

Dear Mr. Sandlin:

   You have asked that we advise you whether Azufrera, any of its United States agents, representatives or subsidiaries could, under the Antidumping Act of 1921, as amended,

and the regulations promulgated thereunder post the bond required upon publication of a six month Withholding of Appraisement Notice.

   *    *    *    *    *    *

   .  .  . Based upon conversations with Customs officials, and later confirmation by said officials that their earlier advice to us was correct (see Memorandum to File enclosed herewith which sets forth the substance of these conversations) *we would consider it appropriate for Azufrera or its subsidiary, PASCO Terminals, Inc., to act as the importer of record for Azufrera's sulphur shipments to the United States* and to furnish, in that capacity, the bond which, after the publication of the Withholding of Appraisement Notice, might be required by the District Director of Customs. [Emphasis added.]

1971, a day later, are a total fiction.[12] These were phantom transactions.

The consumption entry, made out by D & A, allegedly by mistake, to the account of DuPont in fact reflects the true nature of the transaction. DuPont was indeed the owner or consignee of the merchandise and, for customs purposes, Pasco's relationship to this entry, although it reimbursed D & A for the duties, is that of a volunteer.[13] In this capacity, Pasco clearly had no standing, as importer, consignee or agent under section 514, *supra*, to file a protest and hence, with regard to this entry, has no standing to invoke the jurisdiction of the court. See e. g., *T. W. Holt & Co. v. United States*, 28 Cust.Ct. 504, 506, Abs. 56756 (1952), *aff'd* 41 CCPA 8, C.A.D. 522; *E. H. Corrigan v. United States*, 35 CCPA 10, 18, C.A.D. 364 (1947); *Top Form Brassiere Mfg. Co. v. United States*, 68 Cust.Ct. 288, 301, R.D. 11770, 342 F.Supp. 1167 (1972). See also *Stahlmann v. Vidal*, 305 U.S. 61, 64, 59 S.Ct. 41, 83 L.Ed. 41 (1938).

Turning to entries 004007 and 066A, it is noted that the former covers 2500 long tons of sulphur exported from Coatzacoalcos on November 30, 1971 and imported into the United States on December 8, 1971, with delivery made at Thompson's Point, New Jersey, and that the latter covers 1324 long tons of sulphur also exported on November 30, 1971 on the same vessel and imported on December 9, 1971 with delivery at Deepwater Point, New Jersey.

Azufrera's invoices to Pasco, which were filed with the entries, are dated December 6, 1971, and show (1) with respect to entry 004007 a sale, f. o. b. Coatzacoalcos, to Pasco of 2500 L/T of crude sulphur totalling $71,-250.00, including insurance and freight, shipped to Thompson's Point, New Jersey and (2) with respect to entry 066A a sale, f. o. b. Coatzacoalcos, to Pasco of 1324 L/T of crude sulphur, totalling $37,734.00 freight and insurance included, delivered to Deepwater Point, New Jersey. The affidavit of Miramontes, as previously observed (note 5, supra) states that this sulphur, according to Pasco's records, was purchased by Pasco on December 6, 1971, as shown by the invoices.

Accordingly, at the time of exportation on November 30, 1971 of the merchandise covered by these two entries, Azufrera was not only the exporter but the owner of the goods until the sale to Pasco on December 6. However, under the original sales agreement, DuPont was to take title to the merchandise from Azufrera at the time of lading at Coatzacoalcos, assume the risk of loss, and be covered by cargo insurance issued by a company it approved. But the supplemental agreement makes no provision whatever for the change in the circumstances of the involved parties to the original agreement and of Pasco's subsequent involvement. Thus, totally lacking in the supplemental agreement is any provision as to who would bear the risk of loss and be covered by cargo insurance when the vessel left the Mexican port on November 30. Nor is there a scintilla of evidence in the record as to these matters or indeed any indication that any changes with respect thereto were ever made. Instead, the court is called upon to assume, in the absence of any proof, that all aspects of the transactions provided for under the original agreement were changed, where necessary, in order to carry out the so-called supplemental agreement.[14]

---

**12.** Azufrera's invoice to Pasco covering entry 003575 incorrectly lists November 11, 1971, instead of October 13, 1971, as the date of shipment.

**13.** The merchandise was not entered until November 29, 1971. We find no support in the record for plaintiff's counsel's claim, specious on its face, that the merchandise was subject to antidumping duty only because of failure of the Customs Service to process the entry "promptly" (R. 35). The declaration of D & A as nominal consignee is dated November 23, 1971, long after the Withholding of Appraisement Notice.

**14.** Plaintiff asserts in its memorandum, p. 5, that "inconsistent language in the underlying sulphur sales contract must yield to the written expression in the December 3, 1971 letter of agreement" [i. e., the supplemental agreement], without even attempting to explain how the provisions were changed to accommodate the new commercial reality.

It is also to be noted that Pasco's invoices 1374 and 1375, which relate to entries 004007 and 066A, respectively, bill DuPont in the amount of $71,696.03 for 2515.650 L/T of "Crude sulphur (liquid) delivered to you at Thompson's Point, N. J., aboard the S.S.H.H. Jaquet # 154," and for $36,451.50 for 1279.000 L/T "Crude sulphur (liquid) delivered to you at Deepwater Point, N. J., aboard the S.S.H.H. Jaquet # 154." [15] Both invoices are dated November 30, 1971 (coincidentally the date of exportation), some six days before the alleged sales of the sulphur on December 6 from Azufrera to Pasco and eight days before the merchandise was imported into the United States.

While a party is not precluded from selling after-acquired property, with title to pass upon delivery, the invoices alone, in the absence of corroborative evidence, do not appear to support plaintiff's claim in its memorandum, p. 9, that, under the supplemental agreement, "DuPont was *both purchasing* and taking title to the sulphur in the United States *after importation*." [Emphasis added.]

Furthermore, it is inexplicable that merchandise which had already been imported into the United States by Pasco for delivery to Thompson's Point and Deepwater Point would thereafter be sold, as plaintiff claims, to DuPont on a "c. i. f. Thompson's Point" and "c. i. f. Deepwater Point" basis. See plaintiff's response to defendant's interrogatory 5(f) contained in defendant's collective exhibit H. The original 1970 sales agreement provides that it shall be construed in accordance with the laws of the State of New York. Section 2–320(1) of the New York Uniform Commercial Code (McKinney 1964) [16] provides:

(1) The term C.I.F. means that the price includes in a lump sum the cost of the goods *and the insurance and freight* to the named destination. . . . [Emphasis added.]

It is a general rule that, though the seller is required to prepay or credit the cost of transportation, under a c. i. f. contract, the title and consequent risk of loss pass to the buyer upon delivery of the goods on board at the *port of shipment.* See Bugan, *When Does Title Pass from Shipper to Consignee and Who Has Risk of Loss or Damage in Transportation* p. 333 (1951). Plaintiff has not disclosed what arrangements were made with DuPont to avoid the usual ramifications of a purchase on a c. i. f. destination basis.

We also find it significant that, while the record is replete with the details of Pasco's payment (and reimbursement to Dunnington and Arnold in one instance) of the dumping duties, it is curiously silent as to whether, when and how plaintiff paid Azufrera for the merchandise and Caribbean for the shipping charges. Furthermore, the circumstances of DuPont's payment for the sulphur are undisclosed. In this connection, we are constrained to note that DuPont, the beneficiary of these transactions, remains mute. There is nothing on this record by way of testimonial or documentary evidence adduced from an officer or employee of DuPont to verify plaintiff's claims herein.

In short, we find that the affidavits and other documentary evidence relied upon by plaintiff lack specificity and a direct familiarity with the alleged transactions.

15. No explanation is given for variations in the weights and charges between Azufrera's invoices to Pasco and Pasco's invoices to DuPont.

16. See also N.Y. U.C.C. 2–320(2) (McKinney 1964) delineating the obligations of the seller under a contract using "the term C.I.F. destination or its equivalent . . . ," unless otherwise agreed upon. The official Comment of the National Conference of Commissioners on Uniform State Laws and the American Law Institute, states, with regard to this text (N.Y. U.C.C. at 333, McKinney 1964):

Purposes: To make it clear that:
1. The C.I.F. contract is not a destination but a *shipment contract with risk of subsequent loss or damage to the goods* passing to the buyer upon shipment if the seller has properly performed all his obligations with respect to the goods. Delivery to the carrier is delivery to the buyer for purposes of risk and "title". . . . .

We do not think undue emphasis has been placed upon the nature of the evidence offered to meet plaintiff's burden of establishing the existence of the alleged transactions pursuant to the claimed supplemental agreement. The customs laws and regulations require, for reasons that should be unnecessary to expound upon, that form and appearance comport with reality. In other words, when entries of merchandise are made, as here, based upon commercial transactions, the entries, invoices and other documents filed therewith must accurately reflect the actual transaction that took place. Furthermore, any right which a party may have under the laws to file a protest or to commence an action in this court is based upon his relationship, as defined by statute, with respect to that transaction.

Accordingly, taking into account all of the circumstances surrounding the alleged transactions as revealed by the documents submitted herein, including the fabricated invoices submitted in connection with entry 003575; the lack of any direct confirmation of the alleged supplemental agreement or that it became effective on November 8, 1971; the fact that the invoices prepared for entries 004007 and 066A were for alleged sales which did not even accord with plaintiff's claims; and the absence of any corroborative evidence of those sales, we are compelled to conclude that plaintiff has failed to establish that it was in fact "commercially" an importer or consignee of the merchandise.

Nor was plaintiff an importer [17] or consignee in law. Dunnington and Arnold, which entered the merchandise as importer of record and nominal consignee and indisputedly was liable to the government for the payment of the duties, was the importer and sole consignee for tariff purposes. See section 483 of the Tariff Act of 1930 (19 U.S.C. § 1483).[18] Since no owner's declaration and superseding bond were filed, D & A was the sole statutory consignee and hence acquired all the rights of a consignee under the tariff laws, including the right to file a protest under section 514. See *Top Form Brassiere Mfg. Co., Ltd. v. United States, supra*, 68 Cust.Ct. 288, and cases cited therein.

Furthermore, even applying the most liberal construction of *United States v. Wedemann & Godknecht, Inc., a/c Atwater Throwing Co., et al.*, 515 F.2d 1145, 62 CCPA 86, C.A.D. 1151 (1975), relied upon by plaintiff, we do not find that plaintiff was, for purposes of section 514, an "agent of the person paying any charge." Indeed, in its memorandum, p. 6, plaintiff's primary contention is that "through a chain of command Dunnington & Arnold was acting at the explicit bidding of Pasco Terminals."

Nor will the equities of the situation allow us to permit plaintiff, as its counsel has suggested (R. 37), to have Dunnington and Arnold go through the act of appointing Pasco as its agent for the purpose of ratifying the latter's acts, i. e., filing of the protests and commencement of the suit herein. For Pasco's role, as it appears on this record, was to serve on paper as the phantom conduit through which illusory transactions were to be funneled to avoid payment by DuPont of any dumping duties.[19] Consequently, to countenance such a charade would be tantamount to subversion of the tariff statutes.

**17.** Plaintiff also became aware of its lack of standing as an "importer" and amended its complaint to allege that it was "the consignee of the merchandise" and not, as formerly claimed, "the importer of record."

**18.** Section 483 provides in part that—
For the purposes of this subtitle—
(1) All merchandise imported into the United States shall be held to be the property of the person to whom the same is consigned; and the holder of a bill of lading duly indorsed by the consignee therein named, or, if consigned to order, by the consignor, shall be deemed the consignee thereof. The underwriters of abandoned merchandise and the salvors of merchandise saved from a wreck at sea or on or along a coast of the United States may be regarded as the consignees.

**19.** Also to be noted is plaintiff's success in avoiding assessment of double dumping duties as required by 19 C.F.R. 153.49 and 153.56, *supra*, although these regulations were applicable to it as an "exporter" under section 207 of the Antidumping Act of 1921 (19 U.S.C. § 166).

Turning to the remaining entry, number 062A, we note that it covers 4000 L/T of sulphur exported on November 11, 1971, imported on November 16, 1971 and delivered to Deepwater Point. Azufrera's invoice accompanying the entry is dated November 9, 1971, and Pasco's invoice No. 1369, which bills DuPont in the amount of $116,194.56 for 4077.002 L/T of "Crude sulphur (liquid) delivered to you at Deepwater Point, N. J. aborad [sic] the SS H.H. Jaquet # 153," is dated November 10, 1971. Thus, the invoices show a sale from Azufrera to Pasco and a resale from Pasco to DuPont *prior to* exportation of the merchandise. The fact, too, that the resale to DuPont was characterized by plaintiff as "c. i. f. Deepwater Point" further demonstrates that this resale took place in Mexico. However, this is totally at odds with plaintiff's claim that Pasco's sale to DuPont did *not* take place until *after* importation. See memorandum, p. 4; R. 24–25. Therefore, the penumbra of certainty and doubt raised in connection with the other three entries looms over this one as well, inasmuch as all were conceived as part of the same scheme. Therefore, in light of the circumstances surrounding these entries, it is clear that plaintiff has failed to show by competent satisfactory proof that it is the importer, consignee or agent as required by 19 U.S.C. § 1514.

In conclusion, based on the exhibits, entry papers and accompanying documents, we find that plaintiff has failed to establish that it had standing under 19 U.S.C. § 1514 to file the protests herein. Consequently, it has failed to meet the jurisdictional prerequisites of 28 U.S.C. § 1582(c)(1). Defendant's motion to dismiss is granted and the action is dismissed.