381 So.2d 607 (1980)
ALABAMA GREAT SOUTHERN RAILROAD COMPANY and the Southern Railway Company
v.
Burl H. McVAY, d/b/a McVay Oil Company.
No. 51653.
Supreme Court of Mississippi.
March 5, 1980.
Rehearing Denied April 2, 1980.
*608 Roberts & Easterling, M.M. Roberts, Hattiesburg, for defendants-appellants.
Zachary & Gillespie, Dave A. Matison, III, Hattiesburg, for plaintiff-appellee.
Before PATTERSON, C.J., and BROOM and COFER, JJ.
PATTERSON, Chief Justice, for the Court:
Burl McVay obtained a verdict in the Circuit Court of Forrest County for $9,196.86 against the Alabama Great Southern Railroad Company and the Southern Railway Company for diesel fuel he had delivered to them. The Court entered a $9,196.86 judgment for McVay. However, when Southern thereafter moved for judgment notwithstanding the verdict, the court, upon reconsidering its previous denial of a peremptory instruction in favor of McVay, entered on its own motion a reduced judgment of $8,916.04 for McVay.
The railroad companies (hereinafter Southern) appeal, contending (1) there was no enforceable contract between Southern and McVay, (2) Southern purchased in good faith from Bonanza Oil Company, not McVay, (3) McVay's conduct estops him to deny that he was an agent of Bonanza, and (4) various procedural errors vitiate the judgment. We reverse and remand to the Chancery Court of Forrest County.
The scarcity of fuel resulting from the OPEC cartel embargo prompted Southern to seek additional sources of diesel fuel to augment supplies under long-term contracts with large oil companies. Neil Coggins, the assistant vice-president for Southern in Washington, received a letter from Bonanza Oil Company of Mobile, Alabama suggesting the availability of diesel fuel. Coggins flew to Mobile to discuss the matter with one Whitehead who had contacted him on behalf of Bonanza. He concluded that Bonanza Oil Company was credible inasmuch as Whitehead had assured him "eyeball to eyeball that he knew the market place." Coggins agreed that Southern would purchase a large quantity of diesel fuel with *609 Whitehead of Bonanza acting "kind of like a broker" for supply.
Thereafter, Southern purchased approximately 2,000,000 gallons of diesel fuel from Bonanza in two transactions, approximately 300,000 gallons of which were to be delivered in Mississippi, a state in which Bonanza had no tax number. Coggins indicated he neither knew the significance of the tax number nor whether Bonanza had one, testifying he was satisfied with Whitehead's assurances and what he described as the "good price" asked by Bonanza. (Bonanza's price, 27 1/2¢ per gallon, did not exceed that charged by Southern's major oil suppliers on long-term contracts for delivery of 100,000,000 gallons or more per year, fifty times the quantity to be supplied by Bonanza on "spot transactions" negotiated during the oil embargo.)
Unfortunately, Bonanza went out of business, Whitehead went to jail, and McVay, who delivered 28,082 gallons of fuel to Southern, met its defense that it had paid Bonanza $7,722.55 for the same oil and would not pay again. McVay spoke with Whitehead only twice, each time by telephone. The first conversation was on December 16, 1974, when Whitehead contacted McVay and indicated Southern needed diesel fuel at its Meridian yard. McVay did not commit himself to deliver the fuel and upon investigating Bonanza discovered it had no Mississippi tax number or permit. McVay then called Whitehead and declined to deal with him, giving as his reason the "unacceptable price" asked and the lack of a Bonanza tax number in this state. McVay explained the absence of a tax number required a higher price to be charged to an unbonded out-of-state distributor.
Through these conversations McVay undoubtedly discovered that Bonanza had some arrangement with Southern to supply it with fuel, but nothing indicates he knew the aggregate needed in Meridian for December delivery. The quantity delivered does not appear in Southern's purchase order to Bonanza, nor in any writing prior to December 19, 1974.
Aware of the need and unwilling to do business with Bonanza, McVay delivered 28,082 gallons of diesel fuel to Southern in Meridian without contacting Southern. Remarkably, no evidence indicates whether this unarranged delivery by McVay would have been considered unorthodox among fuel jobbers during the 1974 fuel crunch.
McVay's driver tendered a delivery ticket to Southern concurrent with the delivery.[1] It bears the name "McVay Oil Company" and is dated December 19, 1974, with an acknowledgment of delivery by Southern through S.P. Hicks, Jr. and Johnny Brown. Hicks, foreman of car repairs for Southern at Meridian, described himself as their "number one man" in the area, and Johnny Brown appears to be their storehouse clerk in that city. Above Brown's signature on the ticket there is written "Southern Railroad Company reg. mat. mgr." (regional material manager). Brown described his duties, saying, "I'm the one that's more or less in charge of shipping and receiving... ." He explained he used the Southern material manager stamp frequently and forwarded stamped documents to Southern's Birmingham, Alabama office.
McVay testified he mailed an "extended invoice"[2] to the Southern Railroad yard, 38th Avenue and Railroad Street, Meridian, Mississippi, on December 19, 1974. The invoice added the price to the bare quantity exhibited on the delivery ticket previously tendered to Southern agents. Identical to the original ticket except for the added figures, it was composed upon one of the copies obtained by McVay following delivery of the fuel.
*610 Apparently, the extended invoice never reached Southern although it was correctly addressed to Southern's Meridian yard where it had done business for seventy-five years. It seems the "extended invoice" may have gone undelivered because Southern's post office box number was not included. The evidence is uncontradicted that the invoice was mailed by McVay as it is also uncontradicted by Southern's agents that it was never received. Be this as it may, McVay testified he for several days did nothing further toward renewing his demand, because he didn't expect payment until some thirty days or so after delivery. He added that before sending a letter of January 29[3], which Coggins construed as a demand for payment, he spoke with Hicks, asking why payment had not been made and then referred to Brown, who referred him to Sitton, another Southern agent, who acknowledged "somebody ought to pay" and promised to get back in touch with him. However, Sitton died before he did so, and eventually McVay was referred to Coggins.
In the course of these events, McVay learned the post office box number of Southern's Meridian yard and mailed his letter of January 29 to that address. After it was received, he again talked with Southern representatives. Coggins then learned of McVay's plight and assured him that he would intercede on his behalf in an attempt to persuade Bonanza to make payment. McVay however, sought more than intercession, claiming then as now, without contradiction, that he never became an agent for Bonanza, because he had declined to engage in the oil transaction with it.
Southern defended against McVay's suit by introducing a copy of the Bonanza invoice[4] of December 20, 1974, to Southern which refers to the fuel delivered on December 19, 1974, including the exact quantity and delivery ticket number. Bonanza's deftness in making it appear that it was entitled to payment is clear although it leaves a puzzling circumstance which arises from McVay's undisputed testimony that he had no contact with Bonanza about the fuel except the two telephone conversations with Whitehead. Just how Bonanza obtained the information leading to prompt payment remains a mystery as does McVay's motivation to deliver a quantity of fuel to Southern without previous communication. In any event, on December 26, 1974, Southern paid Bonanza $7,722.55.
Coggins conceded he didn't know who owned the fuel when payment was made to Bonanza. He admitted he could have easily found out who delivered it before payment, but did not, because "the only thing we were interested in was that the oil was received. We didn't care who delivered the oil." He concluded McVay's delivery ticket of December 19 indorsed by Brown and Hicks was not an invoice, but in responding to the question, "What would have been the purpose of putting the tax number on this attachment if it were only a delivery ticket?," answered, "No reason at all." He added that normally a delivery ticket of this kind was also received from Southern's major suppliers such as Standard Oil. Whitehead's behavior and apparent "judgment proof" condition has thrust upon the courts the difficulty of deciding which of two more or less innocent parties should suffer the loss.
When McVay delivered his fuel, Southern agents received and signed the unextended invoice omitting price but including quantity. This constituted conduct "sufficient to show agreement," assuming the actual or apparent authority of Hicks and Brown together to receive fuel without prior direction from Southern's Washington office. See Miss. Code Ann. § 75-2-204 (1972); Squillante & Fonseca, 1 Williston on *611 Sales §§ 7-2 and 7-3 (4th Ed. 1974). The law supplies a reasonable price in the absence of an agreement. Miss. Code Ann. § 75-2-305(1) (1972); Squillante & Fonseca, supra at § 9-2. The parties in this case reached no agreement as to price, because McVay's "extended invoice" never reached the attention of any Southern agent. Some evidence suggests the amount ultimately awarded by the court, $8,916.04, constituted a reasonable price in the trade. This amount, $280.82 less than the amount found by the jury, equaled McVay's cost, according to his testimony. However, whether Southern could justifiably regard Bonanza rather than McVay as the seller is a distinct matter treated below in connection with the appellant's estoppel argument.
As for the issue of good faith purchase, nothing in the record shows the existence of any "transaction of purchase" between McVay and Bonanza. Bonanza had no title whatsoever to the fuel delivered by McVay, either voidable or otherwise. Having no title, it could pass none, at least in the absence of some "entrusting," which clearly did not occur in this case. Southern received McVay's fuel directly from McVay. Therefore, Mississippi Code Annotated section 75-2-403 (1972) has no present application. See gen. Squillante & Fonseca, supra, at §§ 23-13 and 23-14.
Nor does the statute of frauds bar McVay's recovery. His unextended invoice received by Southern agents with the delivery constitutes "some writing sufficient to indicate that a contract for sale has been made between the parties... ." The invoice was "signed by the party against whom enforcement is sought or by his authorized agent or broker." Only the quantity term is crucial to the sufficiency of the writing. Squillante & Fonseca, supra at §§ 14-6 and 14-7. Here the quantity of fuel delivered appeared on the face of the unextended invoice. Even if the unextended invoice had not met the formal requirements of subsection (1) of Mississippi Code Annotated section 75-2-201 (1972), a contract formed by the parties' conduct could nevertheless be enforced under subsection (3)(c), which states that enforceability will not be denied to the extent that "goods... have been received and accepted... ." Moreover, the statute of frauds did not constrain quasi contractual recovery, and again apart from the estoppel issue, the $8,916.04 award could be sustained as such.
As we have said, the trial court set aside the judgment on the jury's verdict and belatedly, on its own motion, granted McVay's previous motion for a peremptory instruction when Southern challenged the verdict through motions for judgment notwithstanding the verdict, for correction of judgment, and in the alternative for a new trial. According to our authorities, a motion for a peremptory ruling should only be granted when the evidence and any reasonable inferences arising from it, when viewed in the light most favorable to the non-moving party, is such that reasonable minds cannot differ as to the legal sufficiency of the claim or defense asserted. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652 (Miss. 1975).
From the totality of the evidence, we think reasonable minds could logically infer that McVay should have realized Southern might justifiably have believed he acted for Bonanza and further that Southern would likely pay Bonanza in reliance upon its belief. These potential inferences, we think, raise a triable issue of fact as to whether McVay could have been treated as an agent of Bonanza by estoppel. We therefore hold the trial court erred in belatedly granting McVay's motion for a peremptory instruction.
Restatement (Second) of Agency, section 8B (1958), reads in part as follows:
(2) An owner of property who represents to third persons that another is the *612 owner of the property or who permits the other so to represent, or who realizes that third persons believe that another is the owner of the property, and that he could easily inform the third persons of the facts, is subject to the loss of the property if the other disposes of it to third persons who, in ignorance of the facts, purchase the property or otherwise change their position with reference to it.
(3) Change of position, as the phrase is used in the restatement of this subject, indicates payment of money, expenditure of labor, suffering a loss or subjection to legal liability.
We approve of this statement, but emphasize that one may be held an agent by estoppel only when from all of the circumstances he realizes or should realize the substantial likelihood that the party suffering the loss will justifiably rely on the tacit representation of agency arising from his conduct. If reliance is only possible, or if reliance is not justifiable in view of the circumstances, including the degree of care exercised by the party suffering the loss, agency by estoppel should not be found to come into play. Cf. Restatement (Second) of Contracts § 90. In sum, the question on remand is whether McVay should have realized his conduct was substantially likely to cause Southern reasonably to mistake the party entitled to payment.
We think the Chancery Court of Forrest County to be the appropriate court to resolve this factual issue. Therefore, indulging the authority conferred by Mississippi Constitution (1890) section 147, we remand to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.
*613 
*614 
*615 
*616 
NOTES
[1] See Appendix.
[2] See Appendix.
[3] See Appendix.
[4] See Appendix.