ORBISPHERE
CORPORATION, Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 87–02–00404.

United States Court of
International Trade.

Oct. 24, 1989.

Barnes, Richardson & Colburn, James S. O'Kelly, New York City, Alberto J. Margolies, Jersey City, N.J., for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, New York City, Michael T. Ambrosino, Washington, D.C., for defendant.

OPINION

MUSGRAVE, Judge.

The primary issue in this case is whether, in valuing plaintiff's products for purposes of customs duties, the Customs Service properly used as its measure of value the "transaction value" of the imported merchandise, or should instead have used the "deductive value" of the merchandise as requested by the plaintiff here. The Court has jurisdiction under 28 U.S.C. § 1581(a), and finds that plaintiff has presented ample evidence to overcome the presumption of correctness of Customs' valuation.[1] The proper basis for valuation of the merchandise is its "deductive value" as claimed by plaintiff.

BACKGROUND

Plaintiff Orbisphere Corp. (Orbisphere) sells scientific devices that detect, measure, and analyze oxygen and other gases. These devices are manufactured in Switzerland by Orbisphere Laboratories (Orbisphere Labs), a subsidiary of Orbisphere. Both Orbisphere and Orbisphere Labs are incorporated in Delaware. The operation's administrative offices are in Geneva and most of its executive personnel are based there. Orbisphere maintains four sales offices in the United States—in Emerson, New Jersey; Houston, Texas; Mount Prospect, Illinois; and Huntington Beach, California.

At the time of the transactions at issue, sales orders for the analyzers were solicited from U.S. customers by Orbisphere sales staff working at the four U.S. sales offices. Once received, the orders are forwarded to the New Jersey office, which then forwarded the order to the Orbisphere Labs Geneva office where the ordered item

---

1. *See* 28 U.S.C. § 2639(a)(1) (1982).

was manufactured. The completed item was then shipped from Geneva to the New Jersey office where the merchandise was unpacked, inspected, adjusted if necessary, repacked in a different container, and then shipped to the U.S. purchaser. Invoices were sent to the purchaser from the New Jersey office which office also received payment from the customer and deposited the payment in the company's U.S. bank account. All revenues from these sales in excess of the salaries and other costs attributable to the U.S. sales offices were ultimately remitted to the Geneva office; the U.S. offices, therefore, were "cost centers", not "profit centers".

The prices of products sold by Orbisphere were determined by the Geneva office, in consultation with staff from the American offices, and were distributed in the form of a price list prepared by the Geneva office covering all items produced by Orbisphere. The local U.S. sales offices had no discretion to vary these prices in concluding sales with their customers. The Geneva office also established the terms and conditions of sale of Orbisphere products, and the U.S. sales offices had no authority to vary these terms and conditions either.

There was some question at trial as to what were the actual terms and conditions of the sales transactions at issue here. Item 4 of the invoices used by Orbisphere after 1983 and at the time of trial recites that on all sales "title and risk of loss passes [sic] from the seller to the buyer on delivery of the merchandise to the carrier at the F.O.B. point indicated in the invoice." Under the heading *"Prices and payment terms"*, item 5 on this invoice, it is stated, "All prices are F.O.B. Haworth, N.J." Item 1 on this invoice, titled *"Orders"*, provides, "Orders are subject to acceptance only at seller's office in Haworth, N.J." (the location of the New Jersey office at the time this particular invoice was sent, and before the New Jersey office was moved to Emerson).

In contrast to these post–1983 invoices, the invoices used in and prior to 1983 state that orders are subject to acceptance "only at sellers office at Geneva, Switzerland.", and that all prices are "F.O.B. Geneva, Switzerland."

In addition to these earlier invoices, the defendant offered into evidence copies of telexes sent by the U.S. sales offices to the Geneva office informing the Geneva office that an order had been placed with the U.S. office for an Orbisphere product. These telexes contained the words "Please accept the following orders:", followed by further information on the person or persons placing the orders, and the items ordered.

The evidence introduced at trial indicates that the following procedures were undertaken when an order was placed with a U.S. sales office. If the order was placed with an office other than the New Jersey office, this receiving office forwarded the order to the New Jersey office. Upon receiving a purchase order, either directly from a customer or from another Orbisphere U.S. sales office, the New Jersey office would prepare a document for internal office records listing the items ordered and assigning to the order a "purchase order number"; this document was referred to by the plaintiff as its "suspense copy". Simultaneously, the New Jersey office would send to the factory in Geneva the telex referred to earlier requesting the Geneva office to "please accept" the order described in the telex and the suspense copy. The Geneva office would ship the manufactured product to the New Jersey office, and this latter office after performing the procedures described earlier would repackage the product and ship the item to the customer. The New Jersey office would then send to the customer an invoice for payment, which payments were mailed directly to the New Jersey office.

Testimony at the trial indicated that Orbisphere insured all of its products sold to U.S. customers for the shipment between Orbisphere Labs, Switzerland and Orbisphere, New Jersey; costs of shipment from the New Jersey office to the purchaser's address were billed (by Orbisphere, New Jersey) to the purchaser separately from the costs of the ordered items.

Prior to 1985, Orbisphere Labs (Geneva) was operated as a division of Orbisphere. During this earlier period, Orbisphere maintained subsidiaries in the United Kingdom, France, and West Germany. When Orbisphere Labs was separately incorporated in Delaware as an Orbisphere subsidiary on 1 January 1985, the stock of the foreign subsidiaries was transferred from Orbisphere to its newly created subsidiary Orbisphere Labs. The U.S. sales offices remained under the control of Orbisphere Labs.

The merchandise at issue in this case comprises several oxygen analyzing apparatuses and their accessories manufactured by Plaintiff at its Geneva facility and imported into the United States in late 1985 and 1986. The Customs Service appraised the items for customs purposes on the basis of "transaction value" pursuant to section 402(a) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. § 1401a(b)). Plaintiff contests this appraisal, and contends here that the items should instead be valued on the basis of "deductive value" under section 402(d) of the above act as amended (19 U.S.C. § 1401a(d)). Defendant argues that the items were properly valued based on "transaction value", and in addition asserts two counterclaims alleging that upward adjustments should be made to the appraisals of several of the items.

## CONTENTIONS OF THE PARTIES AND APPLICABLE STATUTES

In support of the Customs Service's use of transaction value for appraising the merchandise in this case, the defendant argues that the sales of the products were consummated not by the U.S. sales offices, but, rather, by the Geneva office directly with the U.S. purchasers. Consequently, argues the defendant, the merchandise was sold by and from the Geneva office for export to the United States, and was therefore correctly appraised on the basis of transaction value under 19 U.S.C. § 1401a(b).

Section 1401a(a) provides that

(1) ... imported merchandise shall be appraised, for purposes of this chapter, on the basis of the following:

(A) The transaction value provided for under subsection (b) of this section.

(B) The transaction value of identical merchandise. . . .

(C) The transaction value of similar merchandise ... if the value referred to in subparagraph (B) cannot be determined.

(D) The deductive value provided for under subsection (d) of this section, if the value referred to in subparagraph (C) cannot be determined. . . .

The parties have framed their dispute in this case as a contest over whether the applicable standard for appraisal is the transaction value of the merchandise under subparagraph (A), or the deductive value under subparagraph (D).

Subsection (b) of this section defines "transaction value" as

the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

(A) the packing costs incurred by the buyer with respect to the imported merchandise;

(B) any selling commission incurred by the buyer with respect to the imported merchandise;

(C) the value, apportioned as appropriate, of any assist;

(D) any royalty or license fee related to the merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

(E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

This subsection provides further that the transaction value shall be augmented by the items in paragraphs (A) through (E) above only to the extent that the amount in such a paragraph:

(i) is not otherwise included within the price paid or actually payable; and

(ii) is based on sufficient information. If sufficient information is not available with respect to one of these amounts, then the transaction value of the product shall be treated as undeterminable, and the product must be valued under one of the alternative bases provided in section 1401a.

In the context of the present controversy, the most critical language in subsection (b) is that defining "transaction value" as the price paid or payable for the merchandise "when sold *for export to the United States*". The defendant argues that the sales in this case were concluded by Orbisphere's Geneva office directly with the purchasers in the United States. This is so, the defendant claims, because all of Orbisphere's major business decisions were made from the Geneva office by the company's executive personnel, all of whom were based at that office. The Geneva office set the prices at which Orbisphere's products were offered for sale and the terms and conditions governing the sale contracts. The U.S. sales offices, after receiving an order, transmitted to the Geneva office a telex describing the items ordered and stating, "Please accept the following order(s)". After manufacturing the items, the Geneva office shipped the items to the New Jersey office for delivery to the U.S. customer, and paid whatever costs were incurred by the company in transporting the items from Switzerland to New Jersey. When final payment for the items was received by the New Jersey office, these sums were remitted from Orbisphere's U.S. bank account to the Geneva office, less amounts necessary to meet the operating expenses and overhead costs of the U.S. offices.

Additionally, the defendant argues that the commercial practice of Orbisphere in these transactions was accurately stated in the terms printed on the pre–1984 invoices, namely, that all shipments were F.O.B. Geneva, that the risk of loss of the goods shifted to the buyer at that location and, most importantly, that all orders received by the U.S. sales offices were acceptable only by, and at the sole discretion of, the Geneva office. The defendant contends that the changes made in these terms on Orbisphere's invoices after 1983 were merely changes in form, and that the actual practice of the company in later transactions remained the same as that described in the earlier invoices. The U.S. sales, argues the defendant, were always accepted by, indeed could only be accepted by, the Geneva office, and were thus sales "for export to the United States" within the meaning of section 1401a(b).

The plaintiff flatly contradicts the defendant's primary argument and insists that it was the New Jersey office that accepted the orders placed with Orbisphere by customers in the United States. Plaintiff argues further that the ordered goods were shipped from Switzerland F.O.B. New Jersey, and that Orbisphere bore the cost of insuring, and the risk of loss of, the goods during their trans-Atlantic shipment. On the basis of this argument, the plaintiff contends that the sales of the items at issue here were concluded in the United States, and that they were therefore not sales "for export to the United States" as required to make possible transaction value appraisal under section 1401a(b). The plaintiff argues that instead of transaction value, the "deductive value" of the goods is the proper basis for their valuation under section 1401a(d).

"Deductive value" is defined in this section as:

... (d)(2)(A) ...

whichever of the following prices (as adjusted under paragraph (3)) is appropriate depending upon when and in what condition the merchandise concerned is sold in the United States:

(i) If the merchandise concerned is sold in the condition as imported at or about the date of importation of the merchandise being appraised, the price is the unit price at which the merchandise concerned is sold in the greatest aggregate quantity at or about such date.

(ii) If the merchandise concerned is sold in the condition as imported but not sold at or about the date of importation of the merchandise being appraised, the price is the unit price at which the merchandise concerned is sold in the greatest

aggregate quantity after the date of importation of the merchandise being appraised but before the close of the 90th day after the date of such importation.

(iii) If the merchandise concerned was not sold in the condition as imported and not sold before the close of the 90th day after the date of importation of the merchandise being appraised, the price is the unit price at which the merchandise being appraised, after further processing, is sold in the greatest aggregate quantity before the 190th day after the date of such importation. . . .

In support of its characterization of the transactions at issue here, the plaintiff offered testimony at trial to the effect that notwithstanding the existence of the different terms in the pre–1984 invoices, the plaintiff in fact conducted its sales during those earlier times in accordance with the terms printed on the post–1983 invoices. That is, Plaintiff claims that while the terms printed on its pre–1984 invoices state that all orders are acceptable only in Geneva and that the purchase prices are F.O.B. Geneva, in fact the orders during this period were acceptable and accepted at the discretion of the New Jersey office, and the contracts and prices were F.O.B. New Jersey. In any event, plaintiff claims that the modified terms and conditions accurately reflect the business practices of Orbisphere from the time of the changes in 1984, during which time the transactions at issue here occurred.

Plaintiff's first witness at trial, Mr. William J. Miller, joined Orbisphere in 1979, and was the manager of its New Jersey Branch at the time of importation of the merchandise at issue here. When presented at trial with copies of several pre–1984 invoices containing the earlier terms, Mr. Miller testified that these earlier terms did not reflect the way Orbisphere operated in the United States from the time he joined the company. He professed not to know why these terms remained on the backs of the company's invoices when the U.S. operations did not conform to these terms. Mr. Miller also stated that in 1984 when it became necessary to reprint more invoices, he realized that the earlier terms printed on the invoices were inconsistent with Orbisphere's U.S. business practices, and that he consequently then modified the invoices to their present form. According to his testimony, these modified terms on the post–1983 invoices accurately describe Orbisphere's practices with regard to U.S. sales from the time he began working for the firm in 1979. In a colloquy with the Court, Mr. Miller stated that notwithstanding the terms printed on the earlier invoices, the practice of the company during his employment there was that goods were sold to U.S. customers F.O.B. New Jersey, that risk of loss of the goods passed to the customers at New Jersey, and that freight was charged to the customers only from that point to the point of ultimate delivery at the customers' places of business.

Mr. Miller's testimony was supported at trial by Mr. John Franklin who has been employed by Orbisphere in its Geneva office since 1983 as the company's financial comptroller. Mr. Franklin testified that Orbisphere maintained an open freight insurance policy covering all shipments of manufactured products from the company's factory in Geneva to the point of delivery at the U.S. sales offices. Like Mr. Miller, Mr. Franklin stated that in the event of a loss of these products during shipment to the U.S. offices the U.S. purchaser would not be liable for payment, and Orbisphere would suffer the loss.

Plaintiff's argument is in essence that given this scenario the shipments of the products from the Geneva factory to the New Jersey office were merely movements of the goods "from one warehouse to another" in Mr. Franklin's words (Transcript at 87); that the actual sales were concluded wholly within the United States.

## DISCUSSION

The resolution of this controversy depends substantially upon where the sales of the merchandise are deemed to have occurred.

In the case *United States v. Massce & Co., et al.*, 21 CCPA 54, CAD 3568, the Court of Customs and Patent Appeals,

predecessor to the current Court of Appeals for the Federal Circuit, was presented with facts similar to those in the present case. In *Massce*, as in the present case, the plaintiff seller of the merchandise at issue was also the manufacturer of the merchandise. Also, the plaintiff company was based principally in St. Gall, Switzerland, and utilized a selling agency in the United States under the name, the ownership and control of, the Swiss concern. The trial court had described the company's business practices as follows:

> The method of doing business as established by the testimony, is by purchasers in the United States coming in contact either with the American selling agency at its New York office, or by meeting traveling salemen [sic] of the agency as they go through the country offering the merchandise of the St. Gall concern. As a rule, delivery is not made at the time the order for the merchandise is taken by the sales agency from its American clients. The American purchaser furnishes a design of the character of the embroidery he desires, and which he believes will suit the trade in the community where he does business. At the time of placing the order and furnishing the design, the purchaser is informed of the price he will be required to pay for such merchandise. The design is then forwarded by the selling agency to the home office at St. Gall, Switzerland, and the merchandise is made up in accordance with such design, and in due time forwarded to the American selling agency or sent direct to the purchaser. In either event the billing is through the American selling agency. Payment for the merchandise by the American purchaser is to the banking house heretofore referred to, who in turn evidently forwards such funds to the home office in St. Gall.

> \*   \*   \*   \*   \*   \*

> It further appears from the testimony that merchandise is carried in stock at the New York office, but not universally purchased therefrom. It further appears that title to the merchandise remains in the seller until delivery to the purchaser in the United States.

> From the character of the merchandise it appears that each customer desires his own designs, and not those of some other purchaser. For that reason it is not compatible with good business for the sales agency in New York City to carry a very large stock. If the American purchaser refuses to accept the merchandise ordered, or if it is returned for some reason or another, such merchandise may remain in stock to be sold if possible to any one who would see fit to purchase.

*Id.* at 56.

The merchandise delivered to the United States by the seller in this manner was appraised by the Customs Service on the basis of its "export value" under then existing section 402(d) of the Tariff Act of 1930, which value was defined by that section as:

> ... the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The plaintiff importer argued that for goods to be appraised under this section, the goods must have been sold from the country of origin for export to the United States. Based on its contention that the sales at issue were effected not in Switzerland but in the United States by the U.S. sales personnel, the plaintiff argued that the proper measure for their valuation was not export value, but, rather, "United States value", defined by section 402(a)(3) of the 1930 Tariff Act as:

> ... the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery in the

principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

21 CCPA at 55–6.

The trial court had found that title to the goods did not pass to the U.S. purchasers until the goods were delivered to the United States; that "[e]very element of a United States contract of sale is established by this method of doing business." 21 CCPA at 57. The Court of Appeals agreed with this finding, noting that all sales and offers for sale of the merchandise involved were made in the United States. The Court elaborated:

> The mere fact that designs of the merchandise were accepted in Switzerland before the contract made in the United States became complete does not constitute offers for sale in Switzerland. It appears from the record that no purchasers in the United States transmitted to Switzerland offers to buy merchandise such as is here involved, and no offers to sell such merchandise were made in Switzerland. It further appears that there was no contractual relationship entered into in Switzerland between the manufacturer and the purchasers in the United States. We think the fair import of the evidence is that the branch house of the manufacturer in New York sent to Switzerland orders for designs, and that the orders were finally accepted or rejected by the New York branch house[,] for apparently the manufacturer in Switzerland had no communications or relations with purchasers in the United States.

*Id.*

The purchase orders were received prior to the importation of the products, and pay-

ment for the merchandise was made to the plaintiff's U.S. bank, which transmitted the money received to the company's Switzerland office.

In affirming the trial court's decision in favor of the plaintiff company, the Court of Appeals held that "where offers of sale, agreements to sell, and sales are all made in the United States, and none in a foreign country, there can not be an export value of the exported merchandise involved in such transactions." 21 CCPA at 60. The Court found that the proper basis for valuation was the United States Value of the goods, determined under section 402(e) of the 1930 Act.

The decision of the Court of Appeals in *Massce* is instructive in the present case. First, while the statutes involved in the two cases are not identical, the controversies involved are alike in that the choice between the two valuation methods of the statutes at issue in each case (between "export value" and "United States value" in *Massce*, and between "transaction value" and "deductive value" in the present case) depends substantially upon where the sales of the product in question are deemed to have occurred. Second, and related to this legal similarity, the *Massce* decision is instructive for its resolution of the factual issue of where the sales in that case actually took place, an issue also present in the case at bar.

Under section 402(d) of the Tariff Act of 1930, alleged by the government to be applicable in *Massce*, "export value" was defined as the value or price at which the imported or similar merchandise was "freely offered for sale ... *for exportation to the United States, ... at the time of exportation of such merchandise to the United States ....*" (Emphasis added). Similarly, 19 U.S.C. § 1401a(b), alleged by the government to be applicable in the present case, defines "transaction value" as the price actually paid or payable for the merchandise "when *sold for exportation to the United States ....*" (Emphasis added.) While these definitions of "export value" and "transaction value" are not identi-

cal, the crucial element of each for purposes of the present inquiry is the requirement, implicit in the highlighted language, that there have been a sale *abroad* for *export to the United States* before either measure is applicable.

There exists a related similarity between the two valuation measures contended for by the plaintiffs in these two cases. In *Massce* the plaintiff argued that the correct measure for appraisal was "United States value", defined in important part by section 403(a)(3) of the 1930 Tariff Act as the price at which the subject or similar merchandise "is freely offered for sale, packed ready for delivery *in the principal market of the United States* . . . ." (Emphasis added.) The present plaintiff argues that the appropriate measure for appraisal is "deductive value", which is defined in relevant part by 19 U.S.C. § 1401a(d) as, "whichever of [three alternative values provided] is appropriate depending upon when and in what condition the merchandise concerned is sold *in the United States.*" (Emphasis added.) In contrast to the first two statutes discussed, these latter two measures are applicable to sales of merchandise that occur *within the United States.*

The critical concern in both *Massce* and the present case, then, is the question of where the sales of the subject merchandise took place. Indeed, the present defendant does not contest this reading of the statutes involved; rather, the defendant argues that, as a matter of fact, the sales at issue here were consummated outside the United States, so as to implicate transaction value as the appropriate standard for appraisal. Given this similarity of the legal questions presented in the two cases, a congruence of underlying facts should dictate an outcome in the present case that corresponds with the decision in *Massce.*

The similarities between the facts in these two cases is evident from the portions of the *Massce* opinion excerpted above. In both cases, the plaintiff companies were both the manufacturer and the seller of the merchandise at issue. In both cases, the plaintiffs' executive headquarters were in Switzerland. And in both cases the plaintiffs sold products in the United States through a selling agent here under the name, ownership, and the control of the plaintiff parent.

The particulars of the plaintiffs' U.S. business operations also correspond substantially. In each case, the plaintiff effected most of its U.S. sales through employees of its U.S. selling office who travelled to the locations of potential buyers to solicit inquiries and orders. Once received, the purchase orders were transmitted to the headquarters in Switzerland where the products were manufactured and then shipped to the U.S. purchaser, in *Massce* usually, and in the present case always, via the U.S. sales office. Importantly, the orders in both cases generally described products to be manufactured pursuant to specifications peculiar to the particular purchaser. Consequently, at the time a purchaser placed its order with the U.S. sales office, the purchaser expected to receive a product that conformed to its specifications, the purchaser would therefore likely not accept a different product from the seller, and the seller would therefore likely face difficulty in selling the item to a different customer. For these reasons, in neither case did the U.S. sales office maintain an appreciable volume of the products in stock. Payments for the merchandise in both cases were made by purchasers directly to the sellers' U.S. offices, and these offices eventually remitted part or all of the received amounts to the executive offices in Switzerland.

On the basis of these facts in *Massce*, the Court of Customs and Patent Appeals upheld the ruling of the trial court that "[e]very element of a United States contract of sale is established by this method of doing business." Deductively, then, there were no sales "for exportation to the United States"; it was therefore not possible to utilize export (or correspondingly, here, "transaction") value appraisal; and the correct measure of value thus was the United States (here, "deductive") value of the merchandise. Because the present case involves statutes, legal issues, and facts similar to those in *Massce*, the doctrine of *stare decisis* would seem to require a similar outcome here. In fact such an

outcome seems to be required even *a fortiori* here: while the incorporation status of the plaintiffs in *Massce* is not wholly clear from that decision, in the present case both Orbisphere and Orbisphere Labs were American corporations, incorporated in Delaware, at the time of the sales at issue; moreover, while it is also unclear what, if any, terms were included on sales or shipping documents used in the *Massce* transactions, the invoices used by Orbisphere to document the transactions at issue here, supported by testimony at trial, clearly stated that the orders were acceptable at New Jersey, and that title to and risk of loss of the goods passed to the purchasers at that location.

In addressing the appellate decision in *Massce*, the defendant relies primarily on the following statement in a footnote by the Customs Court in *United States v. Mitsui & Co.*, 70 Cust.Ct. 301, A.R.D. 315, 359 F.Supp. 1398 (1973):

> Undoubtedly *Massce* would not be applicable here if Mitsui–Seattle had sent Inman's orders to Japan for acceptance. In *Massce* the appellate court pointed out in dictum that "if offers by purchasers had been transmitted to Switzerland and there accepted by the Swiss manufacturer, we should not hesitate, under the facts of this case, to hold that export value was established...."

*Id.* at 306, n. 2, 359 F.Supp. at 1403. The defendant asserts that the nature of the telexes that Orbisphere's New Jersey office sent to the Switzerland office after receiving orders in the United States shows that it was the orders themselves that were being transmitted to Switzerland, for purposes of acceptance by the Geneva office, not just to relay information required for the manufacture of the products. Defendant emphasizes the language in the telexes requesting that the Geneva office "please accept" the orders described there-in. Additionally, defendant emphasizes the fact that these telexes were sent to Geneva, and responses were received from Geneva, *before* the invoices concerning the merchandise were sent to the purchasers.

Based on these facts, the defendant seems to argue along two different paths that the purchase orders were accepted in Switzerland, not in the United States. First, defendant asserts that the language of the telexes and the fact of their use, alone, show that the orders were accepted in Switzerland. Somewhat differently, the defendant argues that under the Uniform Commercial Code § 2–201(1), contracts for sales of goods for greater than $500 must be in writing to be enforceable; that the relevant writings in this case—the invoices sent to the customers, it is argued—were not sent to the purchasers until the New Jersey office sent the telexes to, and received replies from, the Geneva office; that consequently there were no contracts between the New Jersey office and the purchasers before the time of the correspondence between the New Jersey and Geneva offices; and that this shows that the Geneva office, not the New Jersey office, accepted the orders. From both of these variations of argument, the defendant contends that under the statement quoted in *Mitsui*, above, the *Massce* ruling should not apply in the present case.

Because the Court in *Mitsui*, faced with facts similar to those in the present case, rejected the government's argument that export value, not United States value, was the correct measure for appraisal on those facts,[2] the quotation by the court of the passage from *Massce* constituted *dicta* (indeed, the quoted statement was itself *dicta* in the *Massce* opinion, as the *Mitsui* court noted when quoting it), and one can question the precedential and interpretive value for analyzing the appellate *Massce* opinion

---

2. The Court in *Mitsui* found that on the facts of that case, similar to those in the present case, the export value appraisal contended by the government was erroneous, as there was found to be no export to the United States of the goods involved. Because the plaintiff importer failed to present sufficient data to establish a United States value, however, the court allowed the export value appraisal to stand. Thus, while export value was found to be technically inapplicable, this measure prevailed, in essence by default, because the plaintiff could not sufficiently prove its asserted alternative United States value.

of *dicta* contained in *dicta* from this decision by the Customs Court in *Mitsui*.

In *Mitsui*, the merchandise involved, "Tricaphos", an ingredient used in animal feed, was manufactured in Japan by a company, Onoda, and sold to Mitsui–Japan, a Japanese trading company, which then sold and shipped the product to its unincorporated American branch Mitsui–Seattle, and Mitsui–Seattle then sold the product to American customers. Mitsui–Japan never received orders or other communications directly from the American customers, nor was approval required from Mitusi–Japan of agreements for sale entered into by Mitsui–Seattle with these American customers. Mitsui–Japan did not control the prices at which Mitsui–Seattle could sell the products, and the branch was not required to keep the Japanese headquarters informed of these terms, prices, market conditions or inquiries from perspective customers in the United States.

On these facts, the trial court in *Mitsui* opined as follows:

> The sales from Mitsui–Seattle to Inman & Co. did not give rise to an export value because, in my opinion, it was not a sale in the country of exportation. It was a sale taking place in the United States since the *principal negotiations* and *confirmation* of the sales agreement took place in the United States. I view the inquiries of Mr. Hayaski, the head of Mitsui–Seattle, in querying Mitsui–Japan for a price and the availability of the merchandise, as being in the nature of *information inquiries* and not indications that the power of confirmation existed elsewhere than in the Seattle branch. On this point, I consider facts herein similar to those in *United States v. Massce & Co.* ...

68 Cust.Ct. 271 (Emphasis added).

In its opinion discussed above, the Second Division, Appellate Term agreed with this opinion of the trial court, and wrote,

> [The government] attempts to distinguish *Massce* from the present case on the basis that Inman's orders to purchase Tricaphos were subject to acceptance by Mitsui–Japan.[3] However, the record does not establish that Inman's orders were subject to acceptance in Japan, but on the contrary, affirmatively establishes precisely the reverse.

> Appellant stresses that before Mitsui–Seattle entered into any sales agreements with Inman, the importer first entered into agreements with Mitsui–Japan to obtain the merchandise. We think it apparent that *no prudent seller would agree to sell a product that he does not have in his inventory or at least is assured of obtaining from his supplier before he is obliged to make delivery to this customer*. In any event, whatever the reason for the particular sequence of agreements, such *sequence does not establish that Inman's offers or orders were accepted or approved by Mitsui–Japan*.

> We have considered the other grounds urged by appellant to distinguish *Massce* and have concluded that they too are without merit. In sum, we are clear that the rationale of *Massce* precludes finding an export value upon the basis of sales to Inman, and accordingly, the appraisements made on such basis are erroneous.

70 Cust.Ct. at 306–7 (Emphasis added).

There are differences between the factual scenarios in *Mitsui* and the present case. The communications regarding orders from American customers between Orbisphere's New Jersey and Geneva offices apparently were more detailed than were those between Mitsui–Seattle and Mitsui–Japan. While the executive staff at Orbisphere's Geneva office established the prices at which the company's products were sold by the U.S. offices, this was apparently not the practice with Mitsui's Japan and Seattle offices. It might be argued that these differences make more plausible the contention that Orbisphere's Geneva office was the office whose acceptance of orders was required to consummate contracts with

---

**3.** Footnote 2 at this point in the *Mitsui* opinion is the excerpt concerning *Massce* reprinted earlier in the text of the present opinion.

American purchasers, in contrast to the finding in *Mitsui.*

However, several additional distinctions between the two cases cast doubt on the strength of this argument. First, in the present case the Geneva office was the manufacturer of the equipment sold by Orbisphere's U.S. offices, unlike Mitusi–Japan which was merely a trading company that bought products from unrelated manufacturers and in turn sold these products to its Seattle branch for resale to American customers. Also, the natures of the products themselves differ: in the present case the oxygen-analyzing equipment was manufactured according to the specific orders placed by each purchaser, and the New Jersey office sometimes had to make further adjustments before delivery to the purchaser; on the other hand, while the "Tricaphos" animal feed ingredient involved in *Mitsui* was apparently a distinct identifiable product of the Onoda company, the ingredient appears also to have been in its essence fungible, in that there were apparently no substantive differences in the Tricaphos ordered by and sold to different customers. The import of these differences between the operations and products involved in the two cases is that there was understandably a need for more, and more precise, communications concerning orders between Orbisphere's New Jersey and Geneva offices than between Mitsui–Japan and Mitusi–Seattle. Because Orbisphere's Geneva office manufactured the company's products, and because these products had to be manufactured according to rather precise specifications, it was necessary that this office receive greater information concerning orders placed with the U.S. offices than was required by Mitsui's foreign headquarters concerning orders placed with Mitsui–Seattle. Thus, the fact that more information on U.S. orders was transmitted to Orbisphere's Geneva office does not require a finding that that office retained the

sole authority to accept such offers; rather, it is more plausibly simply an incident of the nature of Orbisphere's products.[4]

Whatever might have been the amounts of correspondence, then, between the respective intra-company offices in *Massce,* *Mitsui,* and the present case, the important issue in each case is whether or not the foreign office concerned maintained the *exclusive* authority to *accept* the orders described in the correspondence. In *Massce* the appellate court found that

> the *acceptance* of the [orders] was, *so far as the United States purchaser was concerned,* made in New York and not in Switzerland, for apparently the *manufacturer in Switzerland had no direct communication or relations with purchasers in the United States.*

21 CCPA at 57 (Emphasis added).

Similarly, Orbisphere's Geneva office had no communication or relations with purchasers in the United States.

The defendant government in *Mitsui* argued that the communications between Mitsui–Seattle and Mitsui–Japan proved that all orders received by the Seattle office were acceptable only by the Japan office, and that the case was distinguishable from *Massce* on this basis. The court disagreed, stating,

> whatever the reason for the particular sequence of agreements, such sequence does not establish that [the American customer's] offers or orders were accepted or approved by Mitsui–Japan.

70 Cust.Ct. at 306.

Thus, the mere fact of the transmission of orders from Orbisphere's New Jersey office to its Geneva office does not show that these orders were acceptable only by the Geneva office; nor is such an authority in the Geneva office established by the language of the telexes. Specifically, the phrase from the telexes, emphasized by the defendant, requesting the Geneva office to

---

4. On the question of whether or not the relevant sales occurred in the United States, it is also noteworthy that while Mitsui–Seattle was, at the time of the transactions concerned in that case, merely an unincorporated American branch office of a Japanese parent company, both Orbisphere and Orbisphere Labs were, at all times involved in this case, American corporations incorporated in the state of Delaware, and the Geneva office was simply a Swiss branch office of this American corporation.

"please accept" the described orders is insufficient evidence in the circumstances of this case to establish that the Geneva office alone was empowered to accept orders from U.S. purchasers. Orbisphere's New Jersey office manager Mr. William Miller testified at trial that this language was "just protocol"; that it was

> a polite way of saying, "Here are some orders." It was the same—the same way we said hello in the telexes that I saw when I first joined the company and we just continued to say that on our telexes as long as we transmitted them.

Tr. at 100.

He agreed that the communication was "in the nature of an advice to build the product." *Id.* at 101. This construction of the phrase comports with general commercial usage, and is certainly plausible in this case, given the natures of Orbisphere's operations and products just discussed. In the light of this and other countervailing evidence here, such as the descriptions contained in Orbisphere's invoices and the testimony of its employees, these two particular words do not alone prove that only the Geneva office, and not the New Jersey office, was authorized to accept orders from customers in the United States.

Defendant's argument based on the Uniform Commercial Code is also a variation of the other arguments discussed above in that it is also addressed to the question of when and where the sales of the products involved here are deemed to have occurred. Section 2–201 of the U.C.C., relied upon by the defendant here, provides,

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The defendant argues that the documents in this case that constitute "writings" for purposes of this U.C.C. Statute of Frauds provision were the invoices sent by Orbisphere's New Jersey office to purchasers of Orbisphere products. Because the New Jersey office did not send these invoices to the purchasers until after its correspondence with the Geneva office, defendant argues that this shows that it was the Geneva office that accepted the orders.

The defendant does not cite any cases or specific statutes through which the model Uniform Commercial Code is directly applicable in this case. The Court has on a very few occasions referred in opinions to parts of the U.C.C. for its own reference[5] or when a U.C.C. provision is directly involved through a specific statute applicable in the case.[6] However, the model form of the U.C.C. is not *per se* applicable, and certainly not in the abstract binding, on this Court.[7] The Court assumes that the

---

5. *Eg, National Corn Growers Ass'n v. Baker,* 10 CIT 345, 373 & nn. 108–9, 636 F.Supp. 921, 950 (1986).

6. *Eg, Pasco Terminals, Inc. v. United States,* 76 Cust.Ct. 204, 215–16 & n. 16, 416 F.Supp. 1242, 1250 (1976) (discussion of § 2–320(1) of the New York Uniform Commercial Code, where sales agreement involved stipulated that the agreement "shall be construed in accordance with the laws of New York.").

7. *Cf. Atlantic Steel Co. v. United States,* 10 CIT 340 (1986), 636 F.Supp. 917, 920 (rejecting plaintiff's citation of U.C.C. as a basis for contesting antidumping determination of International

Trade Administration (ITA), and stating, "The U.C.C. does not control the ITA's choice of methodology in a dumping investigation. . . .").

Moreover, for international contracts for the sale of goods between U.S. parties and foreign parties—which defendant contends the present transactions are—concluded on or after 1 January 1989, the applicable commercial law is not the U.C.C., but rather, the United Nations Convention on Contracts for the International Sale of Goods [UN Doc. A/Conf./97/18 Annex I (Apr. 10, 1980), GAOR, 33d Session, Supp. 35 (A/35/35) at 217; 52 Fed.Reg. 40, 6262–6280 (Mar. 2, 1987); *reprinted in* 18 I.L.M. 639–66 (1980) ] unless the parties expressly contract out of the Convention's coverage.

government refers to it here merely as evidence, and the Court will so treat it.

The requirement in section 2–201(1) of a writing is not phrased in exact or rigid terms. All that is required is "some writing sufficient to indicate that a contract for sale has been made between the parties", which writing is signed by the party against whom enforcement is sought, and which, to be enforceable under subsection (1), provides a quantity term. Section 1–201(46) describes a "writing" as including "printing, typewriting, or any other intentional reduction to tangible form", and section 1–201(39) states that the word "signed" includes within its meaning "any symbol executed or adopted by a party with present intention to authenticate a writing." It is not inconceivable that invoices could satisfy these requirements; some courts have held that they do,[8] and the Court will assume for present purposes that those sent by Orbisphere to its customers do.

However, the government's U.C.C. argument is not persuasive. The mere facts that Orbisphere's New Jersey office mailed the invoices to purchasers along with the products themselves (hardly an uncommon practice), and that it did not do so until after it had requested the Geneva office to manufacture the items (after which it *must* have mailed the invoices if they were to accompany the merchandise in delivery) do not show that the New Jersey office had no authority to accept orders from customers in the United States. It is not unusual in the practices of commerce for parties (especially for merchants, involved here) to enter into sales agreements orally or through very informal documents, which agreements are later memorialized in more formal writings such as a billing invoice; the agreements are no less enforceable be-cause they were not reduced to writing instantaneously at the moment of agreement. Moreover, the policy rationale underlying the U.C.C. statute of frauds is merely an evidentiary one,[9] as opposed to the more formal substantive functions of, for example, the requirement that consideration exist in contracts.

More specific to this case, the invoices that the New Jersey office sent to customers were one sheet of a seven-sheet computer form that was inscribed by the New Jersey office with the data from each order when the order was received by that office. The different sheets were then used by the office for various purposes, such as the internal "suspense copy" maintained in the records of the New Jersey office, the copy sent to the company's accounting office, the copy used as a packing list, and the copies delivered to the purchaser along with the product. Thus, the master copy from which the customer's invoice came was produced at the time the orders were received by the New Jersey office, not when the products were delivered by that office. Moreover, it *was* the New Jersey office that sent these invoices to the purchasers, not the Geneva office. And all of the above was true with regard both to orders received by the New Jersey office directly from customers and to those it received indirectly from the other U.S. offices.

Based on these facts, the Court concludes that the mere sequence of mailings of the invoices and telexes by the New Jersey office are not indicative of whether or not that office was capable of accepting and did in fact accept the orders at issue here.

The Court of Customs and Patent Appeals in *Massce* stated,

---

8. *Eg, Alabama Great Southern Railroad Company v. McVay*, 381 So.2d 607 (Miss.S.Ct.1980) (invoice sufficient under U.C.C. § 2–201(1)); *Dalesso v. Reliable Triple Cee of North Jersey, Inc.*, 167 Ga.App. 372, 306 S.E.2d 415 (1983) (invoice sufficient under U.C.C. § 2–201(2)). *But cf W.H. Barber Co. v. McNamara—Vivant Contracting Co.*, 293 N.W.2d 351 (Minn.S.Ct. 1979) (contract for continuing sales relationship is not proved under U.C.C. § 2–201(1) by single

invoices where each invoice evidences only a single transaction). *See generally* 2 Anderson, Uniform Commercial Code 50–53 (1982) & Supp. 12–13 (1988).

9. *See* Uniform Commercial Code, Drafters' Comments to § 2–201, paragraph 1; 2 Anderson, Uniform Commercial Code 13–14 (§ 2–201:5) (1982).

The mere fact that designs of the merchandise were accepted in Switzerland before the contract made in the United States became complete does not constitute offers for sale in Switzerland.

21 CCPA at 57.

Similarly, the fact that Orbisphere New Jersey might have transmitted orders to the Geneva factory before the agreements made by the New Jersey office with U.S. customers were complete (if the agreements were not already complete by that time) does not constitute acceptance of those orders, in the legal sense of this term, in Switzerland.

## CONCLUSION

It is the opinion of the Court after consideration of the parties' briefs and the testimony and other evidence proffered at trial, that the proper basis for valuation of the merchandise involved in this case is the deductive value of the merchandise under 19 U.S.C. § 1401a(d)(2). The plaintiff has offered ample evidence to establish that the sales of Orbisphere products at issue here were concluded within the United States by a United States company, to United States customers. Consequently, these products were not sold for exportation to the United States as required for "export value" appraisal to be applicable, and the merchandise should have been appraised on the basis of its "deductive value".

All of the sales orders from U.S. customers were solicited and/or received by the U.S. sales offices of Orbisphere, a U.S. corporation. None was ever solicited or received directly by the Geneva office; indeed the Geneva office never had direct communications of any kind with U.S. customers. The terms and conditions printed on the sales invoices for all of the products involved here clearly stated that orders were acceptable only by the New Jersey office, that title and risk of loss on all sales passed to the buyer on delivery of the products to the ultimate carrier at the FOB point stated in the invoice, and that this FOB point was Orbisphere's Haworth, New Jersey office. These invoices, moreover, were produced by the New Jersey office when the particular orders were received, and copies were sent to the customers by this same office along with the products. All payments for U.S. sales were sent to the New Jersey office which deposited the amounts in Orbisphere's New York bank account. This scenario constitutes the archetypical United States sales contract.

Defendant contests this conclusion primarily with circumstantial evidence. Whatever were the terms and conditions printed on the back of Orbisphere's invoices at times past, all of its invoices during the time of the present transactions contained the terms and conditions described in the preceding paragraph. The company therefore was legally bound by these terms and conditions in these transactions, and consequently, for purposes of this case the provisions should prevail over any inconsistent provisions contained in other invoices from earlier times not relevant here. For reasons already discussed, moreover, the timing of transmittal of these invoices to purchasers in the United States does not change the Court's conclusion.

The defendant also attacks the veracity during testimony at trial of one of plaintiff's witnesses, citing alleged inconsistencies between the statements made at trial by Mr. William Miller and earlier statements made by him at a deposition, concerning the differences in terms and conditions on the earlier and more recent invoices. Mr. Miller at trial openly acknowledged these discrepancies in the terms and conditions, and offered an explanation therefor which the defendant has not controverted otherwise than by casting doubt on Mr. Miller's truthfulness. From its vantage point closest to the testimony the Court accepts Mr. Miller's explanation.

Finally, and underlying its entire argument, the defendant asserts that it was the Geneva office that in realty retained control over all of Orbisphere's important obligations, including the acceptance of orders from U.S. customers. The Court has stated its objections to specific portions of this argument, such as those concerning the invoices and telexes. In conclusion, the Court notes that both Orbisphere and Orbi-

sphere Labs were at all times involved here American corporations. Orbisphere Labs, the manufacturing arm of the company was an American subsidiary of Orbisphere, also an American company. The Geneva office was simply a foreign office of this company. Mr. John Franklin testified that literally there was no entity known as "Orbisphere Switzerland", nor as "Orbisphere Geneva", nor as "Orbisphere New Jersey". Rather there was Orbisphere, Inc., a United States corporation which sold products to U.S. customers through its New Jersey office. The defendant does not directly contradict this.

Based on these circumstances, the plaintiff has proved to the satisfaction of the Court that the sales at issue in this case were consummated within the United States, thus rebutting the presumption of the correctness of Customs' valuation, and establishing "deductive value" as the correct basis for valuation of the entries.

Both parties agree that in the event of such a finding, the Court should remand the case to the Customs Service under 28 U.S.C. § 2643(b) (1982) for calculation of duties based on the deductive value of the merchandise. The Court hereby finds for the plaintiff, dismisses plaintiff's counterclaims, and remands this case to the Customs Service for a re-calculation of duties on the basis of deductive value, taking into account all relevant data, and in accordance with this opinion.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that the determination of the Customs Service is reversed; and it is further

ORDERED, ADJUDGED, and DECREED: that the defendant's counterclaims are dismissed; and it is further

ORDERED, ADJUDGED, and DECREED: that this action is remanded to the Customs Service for further proceedings in conformity with this opinion.