UNITED STATES *v.* MASSCE & CO.; RECHSTEINER, HIRSCHFELD & CO.; LADENBURG THALMAN & CO. (No. 3568)[1]

[1] T. D. 46379.

United States Court of Customs and Patent Appeals, April 12, 1933

*Charles D. Lawrence*, Assistant Attorney General (*Peter A. Abeles* and *Ralph Folks*, special attorneys, of counsel), for the United States.

*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellees.

[Oral argument February 8, 1933, by Mr. Folks and Mr. Carter]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court in a reappraisement proceeding, affirming the judgment of the trial judge of said court, who held the dutiable value of the imported merchandise was the United States value as entered by the importers, appellees herein. There were also involved in the decision and judgment of the lower court 27 other appeals to reappraisement, which appeals were ordered dismissed by the lower court for want of jurisdiction; no error is assigned in the appeal before us as to such dismissals.

The appellee Rechsteiner, Hirschfeld & Co. was the exporter, ultimate consignee and owner of the merchandise here involved; the appellee Massce & Co. (Inc.) is a firm of customhouse brokers which made the consumption entry as agent for the ultimate consignee; appellee Ladenburg Thalman & Co. is a banking firm in New York City, acting as financial agent for said Rechsteiner, Hirschfeld & Co.

The merchandise involved, consisting of embroidered and nonembroidered wearing apparel, was exported from St. Gall, Switzerland, in April, 1931, and was appraised upon the basis of export value as such value is defined in section 402 (d) of the Tariff Act of 1930.

Section 402 (d) and 402 (e) of said act reads as follows:

SEC. 402 (d). EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

SEC. 402 (e). UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and

other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

The lower court, First Division, in its decision succinctly stated the principal facts upon which its decision was based as follows:

The evidence established that the seller of the merchandise, Rechsteiner, Hirschfeld & Co. is the manufacturer, whose principal office is in St. Gall, Switzerland; that such manufacturer has an American selling agency in the United States of the same name, controlled, and owned by the St. Gall concern. The American selling agency is not a corporation.

It appears that all returns for sales of merchandise by the American selling agency are made to the home office at St. Gall, Switzerland, through a banking firm named Ladenburg Thalman & Co.

The method of doing business, as established by the testimony, is by purchasers in the United States coming in contact either with the American selling agency at its New York office, or by meeting traveling salemen of the agency as they go through the country offering the merchandise of the St. Gall concern. As a rule, delivery is not made at the time the order for the merchandise is taken by the sales agency from its American clients. The American purchaser furnishes a design of the character of the embroidery he desires, and which he believes will suit the trade in the community where he does business. At the time of placing the order and furnishing the design, the purchaser is informed of the price he will be required to pay for such merchandise. The design is then forwarded by the selling agency to the home office at St. Gall, Switzerland, and the merchandise is made up in accordance with such design, and in due time forwarded to the American selling agency or sent direct to the purchaser. In either event the billing is through the American selling agency. Payment for the merchandise by the American purchaser is to the banking house heretofore referred to, who in turn evidently forwards such funds to the home office in St. Gall. There is some dispute in the testimony as to whether or not the selling agency becomes responsible for all orders taken, if in fact the purchaser finds himself financially unable to pay for the merchandise. Portions of the testimony of Mr. Schmid indicated that they are responsible therefor; but some doubt is thrown on that fact in later testimony offered by Mr. Schmid. This we do not deem important in ascertaining where the sale was made.

It further appears from the testimony that merchandise is carried in stock at the New York office, but not universally purchased therefrom. It further appears that title to the merchandise remains in the seller until delivery to the purchaser in the United States.

From the character of the merchandise it appears that each customer desires his own designs, and not those of some other purchaser. For that reason it is not compatible with good business for the sales agency in New York City to carry a very large stock. If the American purchaser refuses to accept the merchandise ordered, or if it is returned for some reason or another, such merchandise may remain in stock to be sold if possible to any one who would see fit to purchase. The evidence of other witnesses than Mr. Schmid, who have purchased merchandise from this same shipper, indicates they would not purchase a design if they knew it was being handled by other purchasers in the United States.

The court then proceeded to hold that the evidence established that there was no home market in Switzerland for the merchandise in

question and no export market to the United States. In its decision the court stated:

It must constantly be borne in mind that export value, so clearly defined in section 402 (d), is the market value or price at the time of exportation at which such or similar merchandise is freely offered for sale to all purchasers for exportation to the United States. There is not a fact in this record sustaining this method. In addition, section 402 (e) enacts that if the sales are made in the United States freely to all purchasers, then such become sales made in this country, and subject to duty as therein provided. All the facts sustain United States value. The title did not pass until the goods were delivered. Every element of a United States contract of sale is established by this method of doing business.

We are of the opinion that there is substantial evidence in the record sustaining this conclusion of the court below. The fact appears to be that all offers for sale and all sales of merchandise such as or similar to the merchandise here involved were made in the United States and, none were made in Switzerland. The mere fact that designs of merchandise were accepted in Switzerland before the contract made in the United States became complete does not constitute offers for sale in Switzerland. It appears from the record that no purchasers in the United States transmitted to Switzerland offers to buy merchandise such as is here involved, and no offers to sell such merchandise were made in Switzerland. It further appears that there was no contractual relationship entered into in Switzerland between the manufacturer and the purchasers in the United States. We think the fair import of the evidence is that the branch house of the manufacturer in New York sent to Switzerland orders for designs, and that the orders were finally accepted or rejected by the New York branch house. In other words, the acceptance of the design was, so far as the United States purchaser was concerned, made in New York and not in Switzerland, for apparently the manufacturer in Switzerland had no communication or relations with purchasers in the United States.

At this point we would observe that while the evidence shows that orders had been received by the United States branch of the Swiss manufacturer for the goods here involved, before their manufacture and exportation, there is nothing in the record or entry papers identifying any such United States purchaser.

The Government, however, contends that this court in the case of *Robinson & Co.* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486, held that under section 302 of the Emergency Tariff Act of 1921 transactions similar to those here involved were held to constitute offers for sale in Switzerland, establishing export value of the merchandise there involved, and that, as the provisions of section 402 (d) of the act of 1930 are similar to the provisions of section 302, *supra,* it must be assumed that Congress intended to adopt the definition of export value found by the court in said *Robinson* case.

We would be inclined to accept the view of the Government upon this point were it a fact that the issues and points decided in said case were similar to those here involved, but this we do not find to be the case. In the *Robinson* case the issues are stated in the opinion as follows:

On the facts recited the importer contends; first, that the laces were not sold in Switzerland for export to the United States inasmuch as the title to them and the possession of them remained in the manufacturer until after their arrival in the United States; second, that no offers for sale can be considered as evidence of export value if such offers relate to sales actually accomplished in this country and not to sales to be completed in the foreign country.

The facts in that case are stated in the opinion as follows:

It appears from the record that, whether orders be taken in the United States or in Switzerland, all laces exported to the United States must be paid for in United States currency, and that the price for which such laces are sold includes cost, insurance, freight, and duty paid f. o. b. at purchaser's place of business, New York City, or f. o. b. railroad station, New York City, if the purchaser's place of business be at a point beyond the limits of the city. All laces, whether ordered directly from the manufacturer in St. Gall or through the manufacturer's agent in New York, are consigned to the manufacturer's agent in New York, and billed by the consignee in the consignee's own name to the persons, firms, or corporations placing the order for the laces. Payments for the laces are made to the agents and consignees of the manufacturer and title to the laces remains in the St. Gall manufacturers and shippers until said goods have been actually delivered to the persons, firms, or corporations placing the order for them. Until the goods are delivered the manufacturers and shippers thereof assume all risk and any losses or damages to the goods while in transit must be borne by them. The manufacturer fixes the minimum prices at which the laces can be sold by the agents in the United States, but the agents may sell for higher prices than the minimum and they are entitled to the difference between the minimum and the higher price in addition to their regular commission. In case a person, firm, or corporation refuses to accept the goods or to make demand therefor, any loss resulting from such default is shared by the manufacturer and the agent. Laces, such as those imported, were at the time of their exportation freely offered for sale to all purchasers for a price in American money which included the value of the goods, cost, insurance, freight, and duty paid, delivered at purchaser's place of business in New York City or at the railroad station in New York City, if the purchaser's place of business was beyond the limits of the city.

It appears from the record in that case that from 20 to 25 per centum of the orders for the goods there involved were placed by United States purchasers directly with the manufacturer in St. Gall, Switzerland, and not through its selling agent in New York. Therefore, clearly there were offers for sale of the merchandise in St. Gall because the contract was made there in a substantial number of instances. The question decided in that case was concisely stated by the court as follows:

* * * Where or when the title passed from the foreign seller to the purchaser has nothing to do with export value as defined in section 302, which reads as follows: * * *

So here, if offers by purchasers had been transmitted to Switzerland and there accepted by the Swiss manufacturer, we should not hesitate, under the facts in this case, to hold that export value was established and that it was immaterial where or when the title passed from the foreign seller to the purchaser.

There is no such evidence in the case at bar, but it appears that all offers for sale or purchase were made in the United States, and that purchasers in the United States did not enter the markets of Switzerland at all for the purchase of merchandise like that here involved. We therefore hold that the said *Robinson* case does not control the case at bar, and that there has been no legislative adoption of judicial decision applicable to this case.

The Government further contends that in the enactment of said section 402 (d) of said Tariff Act of 1930, Congress made a change from the predecessor act, section 402 (c) of the Tariff Act of 1922, which change indicated a clear intent to include transactions such as are here involved under section 402 (d), *supra.*

Said section 402 (c) of the Tariff Act of 1922 reads as follows:

SEC. 402 (c). The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. *If in the ordinary course of trade imported merchandise is shipped to the United States to an agent of the seller, or to the seller's branch house, pursuant to an order or an agreement to purchase (whether placed or entered into in the United States or in the foreign country), for delivery to the purchaser in the United States, and if the title to such merchandise remains in the seller until such delivery, then such merchandise shall not be deemed to be freely offered for sale in the principal markets of the country from which exported for exportation to the United States, within the meaning of this subdivision.* (Italics ours.)

In section 402 (d) of the Tariff Act of 1930, the above-quoted language in italics is omitted, and the Government contends that by reason of such omission Congress intended to bring within the provisions of said section all transactions that had been excluded from the provisions of said section 402 (c) of the Tariff Act of 1922.

We can not agree with this contention, especially in view of the legislative history attending the enactment of said section 402 (d) of the Tariff Act of 1930.

In the case at bar, Kincheloe, the trial judge, in his opinion stated:

 * * * Congress evidently had some good reason for changing the definition of export value in the Tariff Act of 1922. It was not an accidental change and Congress evidently had a definite purpose in view when it made the change. To my mind, the report of the Ways and Means Committee of the House of

Representatives, cited in plaintiff's brief and designated No. 7, dated May 9, 1929, to accompany H. R. 2667, on page 168, gave a very good reason why Congress changed the definition of export value in the act of 1922, which is so different from section 302, Tariff Act of 1921. The committee said as follows:

Under the act of 1922, merchandise shipped to the United States to an agent of the seller pursuant to an order or an agreement to purchase (whether placed or entered in the United States or in the foreign country) the title remaining in the seller until delivery to the purchaser is not deemed freely offered for sale for exportation to the United States for the purpose of determining export value. This provision was inserted in the 1922 act to correct what *Congress believed to be a wrong construction of the law under which sales in fact consummated in the United States were considered as export sales.* However, the provision is so broad as to include agreements to purchase entered into in the foreign country which might properly be considered in determining export value, and your committee has left the provision out of the bill. (Italics mine.)

It seems clear from the foregoing quotation that Congress, in the enactment of said section 402 (d), by omitting the foregoing italicized language of section 402 (c) of the Tariff Act of 1922, intended to include within the purview of export value under the Tariff Act of 1930 agreements to purchase entered into in a foreign country, which might properly have been considered in determining export value under the provisions of said section 402 (c) of the Tariff Act of 1922 in the absence of the foregoing italicised portions of said section. We do not think that Congress, by the omission above referred to, intended to bring within the provisions of section 402 (d) of the Tariff Act of 1930 transactions which, neither under the Tariff Act of 1922 nor under any previous tariff act to which our attention has been called, could come within the definitions of export value. Our attention has been directed to no case where there was an entire absence of offers for sale in a foreign country, or sales or agreements to purchase made in a foreign country, in which it was held that there was or could be an export value established of the goods exported from a foreign country.

In other words, where offers of sale, agreements to sell, and sales are all made in the United States, and none in a foreign country, there can not be an export value of the exported merchandise involved in such transactions, and the omission in the Tariff Act of 1930 of the foregoing italicized words of section 402 (c) of the Tariff Act of 1922 should not be construed as bringing within the provisions of section 402 (d) of the Tariff Act of 1930 transactions occurring wholly in the United States.

In conclusion, upon this branch of the case, we find there is substantial evidence in the record sustaining the finding of the court below that there was neither a foreign-market value nor an export value for the merchandise here involved at the time of the exportation thereof, but that its dutiable value was the United States value under the provisions of section 402 (e), *supra.*

The next question to be considered is whether the merchandise in question was "purchased goods" within the meaning of said section 402 (e).

The testimony in the record and the entry papers establish that the ultimate consignee of the merchandise here involved was the branch house of the exporter in New York; that the merchandise, after importation, was taken to said branch house, and was afterwards sent out to purchasers in fulfillment of orders received prior to importation, payment therefor being made to said Ladenburg Thalman & Co., which firm transmitted the money received to the home office of the exporter at St. Gall, Switzerland.

The entry papers also show that the consular invoice contains a declaration, signed by the agent of the exporter, that the merchandise described in the invoice "is shipped otherwise than in pursuance of a purchase, or an agreement to purchase."

It is the contention of appellees, however, that the merchandise was imported in pursuance of an "agreement to purchase" because, when imported, the goods had already been purchased by American buyers and the price in dollars and cents appearing upon the invoice is the actual price which was received for the merchandise.

On the other hand, the Government makes the following contention in its supplemental brief:

Rechsteiner, Hirschfeld & Co., the importers, appellees herein, can not claim allowances for general expenses and profit, because *they* did not purchase but made the goods, nor are they entitled to deduct any commissions, since the record does not show that any commissions were paid or agreed to be paid.

From the time the goods were manufactured, shipped, entered, and until the time of delivery after importation in the United States, they were the property of Rechsteiner, Hirschfeld & Co. They were therefore not purchased by the said company. The Government can not be concerned with the ultimate disposition of the merchandise after release from customs. The shipment of goods pursuant to the agreement to purchase and take title after importation and clearance through customs does not make the imported merchandise "purchased goods" at the time of entry. "Purchased goods" means goods whose purchase was completed at or before the time of entry, that is, an executed contract. The fact that the merchandise before the court was shipped in pursuance of an agreement to purchase by one not the importer involves an executory contract, which, from the viewpoint of the customs, may, or may not, be fully executed at some future time.

We are clear that the merchandise here involved was not "purchased goods" within the meaning of those words as used in section 402 (e), *supra*.

This section is identical with section 402 (d) of the Tariff Act of 1922, which this court had occasion to consider in the case of *Johnson Co.* v. *United States*, 13 Ct. Cust. Appls. 373, T. D. 41318. In its opinion the court, speaking through Presiding Judge Graham, after

quoting the provision of said section relating to commissions, general expenses, and profit, said:

It will be observed this portion of section 402 (d) is divided into two subdivisions, connected by the alternative conjunction "or," which we have italicized. It was the obvious intention of Congress to give to the American purchaser of imported goods some advantages over the foreign importer who produced his goods abroad and then marketed them in this country through its agents or consignees. Therefore, while the section gives to the foreign importer a commission not exceeding 6 per centum, if he incurs such expense, on the other hand it gives to the American importer and purchaser an additional allowance up to 8 per centum for expenses in importing his goods, and allows him profits of not exceeding 8 per centum.

We think the language quoted is directly applicable to the case at bar. If the goods here involved shall be held to be "purchased goods," it will be the foreign importer who will receive the benefit, in payment of duties, of the 16 per centum deduction from the price paid by the American purchasers, for the price paid by them will not be affected. It seems to us that the provision for a commission found in said section 402 (e), *supra*, supports the construction which we give to the words "purchased goods" as used in said section; the language is, "a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase." Under appellees' theory, imported goods consigned to a commission merchant in the United States to be sold on a commission of 6 per centum, if the merchant had contracted for the sale of the goods prior to their importation and the goods were dutiable at United States value, would be considered, in arriving at their dutiable value, to be "purchased goods" and the provision for deduction of commission could not apply in such case, but a deduction for expenses and profit would be allowed. We are clear that such was not the intention of Congress.

We are in accord with the view expressed in the Government's supplemental brief, wherein it is stated that—

To hold that the Government must consider all imported goods which are eventually sold to be "purchased goods" because there is an ultimate purchaser who is under no obligation to the customs, and with whom the Government is not in contact, would render the definition which provides a different deduction for goods sold on commissions from those allowed on purchased goods, absurd and inapplicable.

Appellees in their supplemental brief cite but one case in support of their contention, that of *United States* v. *Carbic Color & Chemical Co.*, T. D. 40859, 47 Treas. Dec. 526, and quote from the syllabus as follows:

*Purchased goods*, within the meaning of subdivision (d), *supra*, are goods imported in pursuance of a purchase or in pursuance of an agreement to purchase.

Upon the basis of this quotation from the syllabus appellees con-
tend as follows:

Section 402 (e) of the act of 1930 is a reenactment of section 402 (d) of the act
of 1922. Congress is presumed to know the judicial construction placed upon the
statutory language used by the court and when it reenacted section 402 (d) of
the act of 1922 without change as section 402 (e) of the act of 1930, it is presumed
that it enacted the provision in the light of the decision and intended that the
same meaning should apply as was judicially held to obtain under the previous
act. *United States* v. *Illfelder & Co.*, 9 Ct. Cust. Appls. 40, T. D. 37901.

We have carefully examined said case of *United States* v. *Carbic
Color & Chemical Co.*, *supra*, and find that the question here under
consideration was not there involved. In that case the claimed pur-
chaser was also the importer, the merchandise being consigned to it.
The importer made the consumption entry and was liable for the duty
upon the merchandise; the exporting firm and the importer were en-
tirely separate concerns, both as to ownership and management.
Subsequent to importation, but prior to making the consumption
entry, the goods having been placed in warehouse, the importer pur-
chased the merchandise involved in said case, and the court held that,
the purchase having been made subsequent to importation, the goods
were not "purchased goods" within the meaning of section 402 (d)
of the Tariff Act of 1922.

We therefore can not agree with appellee's contention that there
was decided in said case the question here involved, and therefore
there has been no judicial determination of the question here involved,
which has met with the approval of Congress.

The facts are undisputed with respect to the question of whether
the merchandise here involved was "purchased goods" within the
meaning of said section 402 (e), *supra*, and we find that the lower
court erred in holding as a matter of law that the goods involved
were purchased goods within the meaning of said section.

We think it proper to observe that the point upon which we find
it necessary to reverse the court below was not discussed either in
the decision upon which the judgment appealed from was entered,
or by the trial judge, and we gather from this fact that the Govern-
ment there did not press the point as it does here, although it was
properly raised in connection with the petition for review by the
division. We find that the Government's assignments of error here
raise the question, and it is properly before us for decision.

There being no substantial evidence in the record warranting an
allowance for expenses and profit in arriving at United States value,
under the provisions of said section 402 (e), the judgment of the lower
court is *reversed* in so far as it is involved in this appeal, and the cause
is *remanded* for further proceedings not inconsistent with the views
herein expressed.