# United States Court of Appeals for the Federal Circuit

---

**MIDWEST-CBK, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2024-1142

---

Appeal from the United States Court of International Trade in Nos. 1:17-cv-00154-JCG, 1:17-cv-00155-JCG, 1:17-cv-00272-JCG, Judge Jennifer Choe-Groves.

---

Decided: January 8, 2026

---

PATRICK KLEIN, Neville Peterson LLP, New York, NY, argued for plaintiff-appellant. Also represented by JOHN M. PETERSON; RICHARD F. O'NEILL, Seattle, WA.

MONICA PERRETTE TRIANA, International Trade Field Office, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by BRANDON ALEXANDER KENNEDY, AIMEE LEE, PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER, BRETT SHUMATE; EMMA TINER, Office of Assistant Chief Counsel, United States Customs and Border Protection, United States Department of Homeland Security, New York, NY.

———————————

Before PROST and CUNNINGHAM, *Circuit Judges*, and
ANDREWS, *District Judge*.[1]

ANDREWS, *District Judge*.

Plaintiff Midwest-CBK, LLC (Midwest) appeals from
the final judgment of the U.S. Court of International Trade
(CIT) denying Midwest's motion for partial summary judg-
ment and granting the cross-motion for partial summary
judgment of Defendant United States.[2] This court has ju-
risdiction pursuant to 28 U.S.C. § 1295(a)(5). We hold that
the CIT ruled correctly in granting the government's cross-
motion for summary judgment that (1) the subject entries
were not deemed liquidated by operation of law; and (2)
Midwest's transactions qualified as sales "for exportation
to the United States" under 19 U.S.C. § 1401a(b)(1). Ac-
cordingly, we affirm.

———————————

[1]     Honorable Richard G. Andrews, District Judge,
United States District Court for the District of Delaware,
sitting by designation.

[2]     Midwest moved the CIT to enter a final judgment
of dismissal against Midwest to permit it to appeal the
case; this dismissal was granted by the CIT. *Midwest-CBK,
LLC v. United States*, 662 F. Supp. 3d 1377, 1378–79 (Ct.
Int'l Trade 2023). As such, the CIT's ruling on the motion
and cross-motion for partial summary judgment merge into
the final decision under Federal Rule of Appellate Proce-
dure 3(c)(4).

## I. BACKGROUND[3]

Midwest was a Minnesota-based retailer of Christmas ornaments and similar items.[4] *Midwest-CBK, LLC v. United States*, 578 F. Supp. 3d 1296, 1298 (Ct. Int'l Trade 2022). For the time period relevant to this case, Midwest "maintained its corporate office in [] Minnesota" and "its inventory, distribution, warehousing, invoicing, and order control departments [in] Ontario, Canada." *Id.* at 1300. Midwest had Canadian bank accounts to pay for expenses related to its Canadian operations. *Id.*

Midwest "purchas[ed] merchandise from foreign suppliers for exportation to Canada." *Id.* Once imported into Canada, this merchandise was stored in Midwest's Ontario-based warehouse. *Id.* Midwest employed a United States-based sales staff to solicit orders and submit them to Midwest's personnel in Minnesota and Ontario. *Id.* Purchase orders were reviewed by Midwest's personnel in Canada, who would prepare the merchandise for shipment from Canada to the United States. *Id.* The purchase orders provided to Midwest's customers included the language: "All prices FOB Buffalo, NY as defined by the New York State Uniform Commercial Code."[5] J.A. 667; *see Midwest-CBK*, 578 F. Supp. 3d at 1300.

The importer of record for merchandise, with a few exceptions, is required to submit "entries" for that merchandise to United States Customs and Border Protection (Customs). *See* 19 U.S.C. § 1484(a). An "entry" means the

---

[3]    For the facts in this background section, we draw heavily from the findings of the CIT. These facts are undisputed.

[4]    Midwest wound up active operations at the end of 2018.

[5]    "The term 'FOB' means 'free on board.'" *Midwest-CBK*, 578 F. Supp. 3d at 1307.

"documentation or data required . . . to be filed with [Customs] . . . to secure the release of imported merchandise from [Customs'] custody, or the act of filing that documentation." 19 C.F.R. § 141.0a(a). Entries must undergo "liquidation" at the time merchandise is brought into the United States. *See* 19 U.S.C. § 1504. "Liquidation means the final computation or ascertainment of duties on entries . . . ." 19 C.F.R. § 159.1.

In 2013, Midwest informed Customs that Midwest would enter merchandise based on its "deductive value," which it then did into 2016. *Midwest-CBK*, 578 F. Supp. 3d at 1301. "Customs subsequently extended the deadline for liquidation of [Midwest's] entries and initiated a Regulatory Audit to determine the proper basis of valuation." *Id.* at 1302. "The audit involved multiple steps, including a risk assessment of the relevant issues, the issuance of a questionnaire, a walkthrough of import practices . . ., interviews with [Midwest's] personnel, and the issuance of a final report." *Id.* By June 14, 2014, Midwest had delivered to Customs all the information Customs had ever requested from Midwest. *Id.* at 1309. "Customs completed its fieldwork on October 14, 2014" and "issued a Draft Audit Report on July 1, 2015, concluding that transaction value," not deductive value, "was the proper basis of [appraisement] for the subject merchandise." *Id.* at 1302. Midwest submitted responsive comments on July 8, 2015, and Customs sought no additional information from Midwest. *Id.* "Customs issued a Final Audit Report to [Midwest] on February 24, 2016, stating that the subject merchandise should be valued on the basis of transaction value." *Id.* After further discussions with Midwest, Customs liquidated Midwest's merchandise according to transaction value, which Customs calculated using the original entered values plus a 75.75% upward adjustment. *Id.* at 1302–03.

Midwest subsequently brought this action. Midwest asserts that Customs improperly appraised the subject merchandise based on transaction value rather than deductive

value. Appellant Opening Br. 25–27. The basis for this assertion is that the sales of this merchandise constituted domestic sales and not sales for exportation to the United States. *Id*. at 27. Midwest also contends that various entries should have been deemed liquidated by operation of law, because Customs "had no basis to extend liquidation of entries after June 14, 2014." *Id*. at 18.

## II. LEGAL STANDARD

We review the CIT's decision granting summary judgment "without deference." *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1988).

The CIT reviews a decision by Customs to extend a liquidation deadline for entries under the abuse of discretion standard of review. *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 768 (Fed. Cir. 1993) ("Customs may, for statutory purposes . . . employ up to four years to effect liquidation so long as the extensions it grants are not abusive of its discretionary authority."); *see Ford Motor Co.*, 157 F.3d at 855 (reviewing extensions for abuse of discretion). Since the CIT granted summary judgment that the undisputed record showed that Customs did not abuse its discretion, we review that decision de novo. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1327 (Fed. Cir. 2025).

We review the CIT's statutory interpretation de novo. *Int'l Customs Prods., Inc. v. United States*, 748 F.3d 1182, 1186 (Fed. Cir. 2014).

## III. DISCUSSION

### A.    Liquidation by Operation of Law

The usual rule is that, absent a proper extension of the liquidation deadline, "an entry of merchandise . . . not liquidated within 1 year . . . shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record." 19 U.S.C. § 1504(a)(1). The Secretary of the Treasury is permitted to extend the

liquidation deadline if "the information needed for the proper appraisement or classification of the . . . merchandise . . . is not available to the Customs Service." 19 U.S.C. § 1504(b)(1).[6] Customs is permitted to obtain up to three such one-year extensions. 19 C.F.R. § 159.12(e).

Before the CIT, the heart of the parties' dispute on this matter was whether Customs properly extended the liquidation period under 19 U.S.C. § 1504(b)(1). Midwest contended that Customs did not have the authority to extend the liquidation period beyond June 14, 2015, because Midwest had fully responded to all of Customs' initial and supplemental requests for information on or before June 14, 2014. *Midwest-CBK*, 578 F. Supp. 3d at 1309. The United States responded that during the period when the extensions were made, Customs was busy collecting and reviewing information from Midwest to determine the proper basis of appraisement of the merchandise. *Id.*

The CIT agreed with the Government's position, holding that Customs had a reasonable basis for extending liquidation in order to complete the audit process, ensure its accuracy, and comply with established standards. *Id.* at 1310. Thus, the CIT found that Customs did not abuse its discretion in so acting. *Id.*

Midwest now raises three arguments on appeal.

First, Midwest argues that Customs' decision to extend liquidation in this case should not be reviewed under an "abuse of discretion" standard. Appellant Opening Br. 23–24. Midwest claims that since Customs possessed all the information it required from Midwest by June 14, 2014, the statutory condition for further extensions under 19 U.S.C. § 1504(b)(1) had disappeared. *Id.* at 24–25. Midwest likens

---

[6]    There are other statutory bases under which Customs may properly extend the liquidation period. As Customs does not assert them, we do not address them.

the facts of this case to those in *Ford Motor Co.*, where this court overturned the CIT's grant of summary judgment in favor of the government and held that "the [CIT] cannot uphold a decision to extend a liquidation if an importer 'eliminate[s] all reasonable bases for making that decision.'" *Ford Motor Co.*, 157 F.3d at 855 (quoting *St. Paul Fire & Marine*, 6 F.3d at 768). The court found that the reasons proffered by Customs to the CIT were "quite circular: Customs delayed because it needed more information yet argues it must have needed more information because it delayed . . . . [Customs] had known [it] needed to perform this task three years earlier. Customs offers no explanation for taking three years to perform this task." *Ford Motor Co.*, 157 F.3d at 856. Given the lack of explanation, the court held that the evidence "could show that Customs abused its discretion in seeking time extensions," making the grant of summary judgment improper. *Id.* at 857.

The facts in *Ford Motor Co.* are readily distinguishable from those in the case before us, however. Based on the undisputed facts in this case, Customs offers good reasons for its extension of liquidation: it conducted several rounds of audits, confirmed the accuracy of those audits, and reviewed them to ensure compliance with Generally Accepted Government Auditing Standards. *See Midwest-CBK*, 578 F. Supp. 3d at 1309. Customs thus submitted sufficient evidence into the record to demonstrate that the extension of the liquidation period was justified in this case. As a result, we hold that Midwest has not "eliminate[d] all reasonable bases for [Customs in] making [the] decision" to extend liquidation. *Ford Motor Co.*, 157 F.3d at 855 (quoting *St. Paul Fire & Marine*, 6 F.3d at 768). We therefore hold, in light of the factual record before us, that Customs' extension of liquidation did not constitute an abuse of discretion.

Second, Midwest argues that the internal review that Customs engaged in cannot form the basis for an extension of liquidation. Appellant Opening Br. 25. It is undisputed

that Customs had received all the information it requested from Midwest for proper appraisement of the subject merchandise on or before June 14, 2014, the date by which Midwest had fully responded to all of Customs' initial and supplemental requests for information. Midwest claims that prolonged internal deliberations do not provide a basis for extending the liquidation period. *Id.* This argument is unconvincing however, because the Court in *Ford Motor Co.* held, "Customs accurately notes that the statute does not require that information justifying a delay must come *from the importer*. A need for internal information from other Customs personnel might also satisfy section 1504(b)(1)." *Ford Motor Co.*, 157 F.3d at 856. The record shows that Customs engaged in several rounds of internal deliberations to verify the accuracy of the information it received and ensure the accuracy of the calculations it derived therefrom.[7] *Midwest-CBK*, 578 F. Supp. 3d at 1309. These rounds of internal review were reasonably necessary for the proper appraisement or classification of the merchandise involved and thus form a proper basis for the extension of liquidation.

Third, *Midwest* argues in its reply brief that the Government's "proffered explanation" for Customs' decision to extend liquidation "is untrue." Appellant Reply Br. 10. The "proffered explanation" is well-supported by citations to the record, Appellee Resp. Br. 47–48, and the claim of untruth is not. Midwest further argues that the "proffered explanation" is "immaterial and cannot satisfy the statutory requirements for lawfully extending liquidation." Appellant Reply Br. 10. The CIT held, and we agree, that "the

---

[7]    This process required Customs to audit more than 560 entries. *Midwest-CBK*, 578 F. Supp. 3d at 1302. "Each entry comprise[s] ten to hundreds of line items, and each line item may include any number of different items that were subject to a particular classification." J.A. 732.

record reflects that Customs was actively engaged throughout the audit process in collecting and reviewing the information needed to determine the proper method of appraisement." *Midwest-CBK*, 578 F. Supp. 3d at 1310. That Customs did not use some of the information in the final appraisement does not undercut the conclusion that Customs reasonably considered the information.

We therefore affirm the CIT's ruling that Customs did not abuse its discretion in extending liquidation and that the entries in question were not liquidated by operation of law.

## B.    Appraisement

There is a hierarchy of various appraisement methods for imported merchandise.[8] 19 U.S.C. § 1401a(a)(1). The

---

[8]    (a) Generally
(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:
    (A) The transaction value provided for under subsection (b).
    (B) The transaction value of identical merchandise provided for under subsection (c), if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2).
    (C) The transaction value of similar merchandise provided for under subsection (c), if the value referred to in subparagraph (B) cannot be determined.
    (D) The deductive value provided for under subsection (d), if the value referred to in subparagraph (C) cannot be determined and if the

default method of appraisement is transaction value; other methods are appropriate if the transaction value of imported merchandise cannot be determined. Transaction value of merchandise is defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States" in addition to various other miscellaneous costs (e.g., packing costs, royalty or licensing fees, commission costs). 19 U.S.C. § 1401a(b)(1).

In order for merchandise to be appraised on the basis of transaction value, the goods must be (1) sold (2) for exportation to the United States. *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1338–39 (Fed. Cir. 1999). Midwest does not contest that the merchandise was indeed "sold." *See* Appellant's Opening Br. 27. Thus, the only question is whether these sales were "for exportation to the United States." This determination is a "fact-specific" one that "can only be made on a case-by-case basis" by a court considering the "reality of the transactions" between the seller and buyer. *E.C. McAfee Co. v. United States*, 842 F.2d 314, 319 (Fed. Cir. 1988).

Before the CIT, Midwest contended that the sales in question were not "for exportation to the United States." *Midwest-CBK*, 578 F. Supp. 3d at 1303. Midwest claimed that, because the merchandise in question was sold "FOB Buffalo, NY" pursuant to the New York Uniform Commercial Code (UCC), sales of this merchandise should instead

---

importer does not request alternative valuation under paragraph (2).

(E) The computed value provided for under subsection (e), if the value referred to in subparagraph (D) cannot be determined.

(F) The value provided for under subsection (f), if the value referred to in subparagraph (E) cannot be determined.

19 U.S.C. § 1401a(a)(1) (bolding removed).

be considered as domestic sales. *Id.* at 1305. Midwest argued that a domestic sale could not be used as the basis of a transaction value appraisement under 19 U.S.C. § 1401a(b)(1). *Id.* In support of this argument, Midwest relied heavily upon *Orbisphere Corp. v. United States*, 726 F. Supp. 1344 (Ct. Int'l Trade 1989). The United States responded by pointing to cases showing that an international sale is not required to apply a transaction value appraisement method under the statute. It also argued that the Court should not apply *Orbisphere* because *Orbisphere* relied on an older case, *Massce*, which was decided under a predecessor version of the statute at issue. *United States v. Massce & Co.*, 21 C.C.P.A. 54 (1933).

The CIT agreed with the United States. It found that *Orbisphere*'s reliance on *Massce* rendered *Orbisphere* unpersuasive and that the existence of the "FOB Buffalo, NY" term was not dispositive evidence that the sales in question were domestic. *Midwest-CBK*, 578 F. Supp. 3d at 1305–07. Applying the law to the facts in this case, the CIT found that customers in the United States would place orders for merchandise located in Canada; the merchandise would then be shipped from Canada to the United States. *Id.* at 1306. The CIT found these transactions constituted sales for exportation to the United States which could serve as the basis for valuing these sales using transaction value. *Id.* at 1306–07.

The crux of Midwest's challenge to the CIT's finding is Midwest's assertion that sales of the merchandise in question occurred entirely in the United States. Appellant Opening Br. 29. Midwest claims these sales should not be characterized as sales "for exportation to the United States" and thus cannot form the basis of a transaction value appraisement. *Id.*

Midwest's argument is unpersuasive.

First, this assertion is not supported by the text of 19 U.S.C. § 1401a(b)(1), which, as the CIT correctly noted,

"does not expressly require that a sale be international or occur abroad" for the use of transaction value to apply. *Midwest-CBK*, 578 F. Supp. 3d at 1306.

Second, Midwest's challenge is not supported by prior case law which suggests that domestic sales may in fact serve as the basis of a transaction value appraisement. In *VWP*, we found that sales between a Canadian manufacturer and its U.S. subsidiary were sales for exportation to the United States that served as the basis for transaction value. *VWP*, 175 F.3d at 1339. We noted, however, "if sales by [the Canadian manufacturer] to [the U.S. subsidiary] cannot serve as the basis for transaction value, then transaction value must be based upon sales by [the U.S. subsidiary] to its U.S. customers." *Id.* at 1334. In *La Perla Fashions*, the CIT considered Customs' use of "the sale between [a U.S.-based distributor] and its U.S. customers" in determining transaction value appraisement; the CIT concluded that "transaction value can . . . be based on [the U.S.-based distributor's] price charged to its U.S. customers." *La Perla Fashions, Inc. v. United States*, 22 C.I.T. 393, 399 (Ct. Int'l Trade 1998), *aff'd,* 185 F.3d 885 (Fed. Cir. 1999). Midwest has not explained why either of these cases would be inapplicable to the facts currently before us.

Midwest's other argument as to why 19 U.S.C. § 1401a(b)(1) should not apply to sales unless they occur abroad rests on its reading of *Orbisphere*. Appellant Opening Br. 39. In that case, U.S. customers placed orders for merchandise at one of the plaintiff's domestic locations. *Orbisphere*, 726 F. Supp. at 1344. The plaintiff forwarded these orders to its office in Switzerland, where the merchandise was manufactured, and then shipped the devices to its customers in the United States "F.O.B. Haworth, N.J." *Id.* at 1344–45. The CIT, relying heavily upon the *Massce* court's interpretation of § 402(d) of the Tariff Act of 1930, found that the choice between using transaction value and deductive value "depend[ed] substantially upon where the sales of the product in question are deemed to

have occurred." *Id.* at 1350. Though the *Orbisphere* court conceded that "definitions of 'export value' [under the Tariff Act of 1930] and 'transaction value' [under 19 U.S.C. § 1401a(b)(1)] are not identical, the crucial element of each . . . [is] that there have been a sale *abroad* . . . before either measure is applicable." *Id.* at 1350–51. The CIT concluded that the sales at issue in *Orbisphere* "were consummated within the United States," thus "establishing 'deductive value' as the correct basis for valuation of the entries." *Id.* at 1358.

The CIT in the case before us correctly found *Orbisphere* unpersuasive due to its heavy reliance upon *Massce*. The *Massce* decision interpreted § 402(d) of the Tariff Act of 1930. That section of the act stated that the "export value of imported merchandise shall be the market value or the price . . . at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets *of the country from which* [*it is*] *exported.*" *Massce*, 21 C.C.P.A. at 55 (emphasis added). Thus, *Massce* interpreted statutory language that defined "export value." The statutory language relevant in *Massce* expressly based the relevant determination on sales outside the United States.

The Trade Agreements Act was passed in 1979. As the CIT correctly noted, the Trade Agreements Act "removed all references to foreign markets in which merchandise might be traded." *Midwest-CBK*, 578 F. Supp. 3d at 1306. In addition, as the Senate Committee on Finance specifically noted in its report on the Trade Agreements Act, "[t]he use of transaction value as the primary basis for customs valuation will allow use of the price which the buyer and seller agreed to in their transaction as the basis for valuation, rather than having to resort to the more difficult concept[] of . . . 'principal markets of the country of exportation.'" S. Rep. No. 96-249, at 119 (1979). Our subsequent case law has also indicated that § 402(d) of the Tariff Act of 1930 "was repealed in 1979 by the Trade Agreements Act of 1979." *VWP*, 175 F.3d at 334. Thus, the CIT's holding in

*Orbisphere* relied upon the *Massce* court's interpretation of a different term ("export value") with a differently worded definition in a superseded statute. We therefore find *Orbisphere* unpersuasive. The CIT correctly decided that 19 U.S.C. §1401a(b)(1) does not require an international sale or a sale abroad to have occurred for a sale of merchandise to be considered as a sale "for exportation to the United States." Domestic sales, in certain circumstances, may qualify as the basis for using transaction value as an appraisement method.

Finally, Midwest argues that the purchase orders for the subject merchandise included the language, "FOB Buffalo, NY," which indicates that the sales in question constituted domestic sales. Appellant Opening Br. 33–35. Since we find that a domestic sale can serve as the basis for appraisement based on transaction value under 19 U.S.C. § 1401a(b)(1), we need not reach the merits of this contention.

Accordingly, we agree with the well-reasoned opinion of the CIT: "After conducting a fact-specific inquiry of whether the sales were for exportation to the United States under 19 U.S.C. § 1401a(b)(1), . . . the undisputed evidence demonstrates that [Midwest's] sales were for exportation to the United States at the time of the sale." *Midwest-CBK*, 578 F. Supp. 3d at 1304. Transaction value is the proper basis of appraisement.

## IV. CONCLUSION

We have considered Midwest's arguments and find them unpersuasive. Accordingly, the judgment of the Court of International Trade is affirmed.

**AFFIRMED**